THE STATE OF OHIO, APPELLANT, *v.* CARTER, APPELLEE.

(No. 78-1434—Decided November 14, 1979.)

*Mr. Stephan M. Gabalac,* prosecuting attorney, and *Mr. Carl M. Layman, III,* for appellant.

*Messrs. Murty, Burdon & Pierce* and *Mr. Charles E. Grisi,* for appellee.

*Per Curiam.* Initially, we are asked to decide whether the decision in *Henderson* v. *Morgan* (1976), 426 U. S. 637, should be given retroactive effect to the cause now before this court.

The state argues that *Henderson, supra,* should not be applied retroactively to a guilty plea that was taken in 1972. The effect of its argument is that *Henderson* represents a new constitutional rule of law which overrules earlier decisions concerning voluntary guilty pleas. The state argues further that to apply the new requirements presented in *Henderson, supra,* would upset the effective administration of justice and destroy justifiable reliance in the old rules. Rather than analyze and weigh the positive and negative aspects of retrospective application, we find that retroactivity is not an issue in the present cause for the reason that *Henderson* did not espouse a new constitutional rule of law.

The opinion of the court in *Henderson, supra,* relied on established rules of law; it did not declare a new constitutional rule and neither did it express the belief that the opinion would have retroactive consequences. Only the dissenting opinion raises such a possibility. The concurring opinion of Justice White discusses the dissent's argument and explains what is required before a constitutional rule will be applied retroactively. He states, at page 651, as follows: "In order to escape application of a constitutional rule to a particular

criminal case, on non-retroactivity grounds, the State must point to a judicial decision occurring after the operative facts of the case in question clearly establishing the rule." The phrase "clearly establishing the rule" modifies "judicial decision." In other words, for the state to argue that *Henderson* should not be retroactive, it must be able to point to a judicial decision *(Henderson)* and state that such decision established a rule that was different from the one in effect when the guilty plea (the operative facts) was taken.

It is quite evident that the concurring opinion had grave doubts whether *Henderson* represented a new rule of law. Justice White, at pages 651-652, states: "Either this is a new constitutional rule being established in *this* case* * *, or, as I believe to be true, this case rests on the long accepted principle that a guilty plea must provide a trustworthy basis for believing that the defendant is in fact guilty." The sentiment raised in the latter portion of this statement is affirmed by the court's opinion. In stating what constitutes a voluntary plea, Justice Stevens, at page 645, wrote for the court:

"* * *[T]he plea could not be voluntary in the sense that it constituted an intelligent admission that he committed the offense unless the defendant received 'real notice of the true nature of the charge against him, the first and most universally recognized requirement of due process.' *Smith* v. *O'Grady,* 312 U. S. 329, 334."

The statement that a defendant has not been advised by his counsel, by the court or anyone else, of the essential elements of the crime with which he was charged, is only another way of stating that the defendant has not received real notice of the true nature of the charge against him. This is not a new rule; it is a restatement and simply expounds upon the fundamentals of due process. For the foregoing reasons, we decline to discuss the retroactive application of *Henderson.*

In determining whether the defendant's plea was made voluntarily, intelligently and knowingly, we look at the due process requirements as they existed at the time the defendant changed his plea from not guilty to guilty of second degree murder. The state and federal requirements were as follows: that the defendant had been advised of the rights he

was waiving, that he understand those rights, that he was motivated by a desire to avoid a more severe penalty, that he received real notice of the nature of the charges against him and that he understood those charges. See *State* v. *Piacella* (1971), 27 Ohio St. 2d 92; *Smith* v. *O'Grady, supra.*

The question before this court is whether the defendant received notice of the charges levelled against him and, if so, did he understand the nature of those charges. As to the latter requirement, there is no easy or exact way to make such a determination, *i.e.*, to determine what someone subjectively understands. If the defendant receives the proper information, then we can ordinarily assume that he understands that information. In this case, we must decide whether defendant's counsel, or someone else, provided defendant with information or notice of the charges. To do so, we look at all the particular facts and circumstances surrounding the case. *Johnson* v. *Zerbst* (1938), 304 U. S. 458, 464.

This same "totality of the circumstances" test was employed in *Henderson,* although there the majority held that, under all the circumstances, the government could not establish that the defendant was aware of the nature of the charges against him. The trial court in *Henderson* found that the " 'petitioner was not advised by counsel or court, at any time, that an intent to cause the death or a design to effect the death of the victim was an essential element of Murder 2nd degree.' " (*Henderson,* at page 640, fn. 6.) The Supreme Court, at page 647, stated that "***[t]his case is unique because the trial judge found as a fact that the element of intent was not explained to respondent." But, as the *Henderson* court also stated: "***even without such an express representation, it may be appropriate to presume that in most cases defense counsel routinely explain the nature of the offense in sufficient detail to give the accused notice of what he is being asked to admit."

The present case differs from *Henderson.* The trial court in the cause *sub judice* found that the attorney *could not specifically recall* discussing with or advising the defendant regarding the element of second degree murder and that as a result the defendant was never specifically informed of the essential elements of the charge against him. The court did

not say the attorneys failed to inform; it simply stated that the attorney could not specifically recall. We find further from reviewing the record of the evidentiary proceeding that the defense counsel's routine practice at the time they represented the defendant was to discuss with a client all the different elements and degrees of a crime.

At the evidentiary hearing, one of defendant's counsel responded: "Did I in those years advise clients about the differences in the degrees of crime? Yes. It was then necessary even in those days and we did discuss with the clients intelligently the questions of the particular crime with which they are charged. Do I recall independently having discussed with George Carter the elements of all these crimes—because I briefed him and had them written out for my own benefit. Did I discuss them with him? I cannot independently recall that at this point in time. *Undoubtedly, I would say honestly I did, but I don't recall it* and I don't know when it occurred and I don't know under what circumstances it may have occurred because we were concerned in this case with the differences in the degrees. This is what it is all about." (Emphasis added.)

Counsel for the defendant was being candid and ethical in stating that he could not specifically recall. He did not say, "No, I didn't advise my client"; he said, in effect, "I normally did but because of a lapse of six years I can't honestly recall." This is not the same as in *Henderson*. Furthermore, defendant's counsel answered the following question, "Do you recall the day that the trial was over discussing the idea of pleading to a lesser included offense?," by saying:

"Once again, I have to preface my remarks,***, in the same caveat and the same admonition that I do not particularly remember discussing with him or the circumstances or the place or the time, *but I do know that I did* because I noted it in my report to the court, the time spent, that we had a conference with the client, both Mr. Portman and I, about what he was about to do. So we did discuss something."

The application for attorney's fees supports this statement. On December 17, 1972, a telephone conference with client regarding trial and discussion of plea is listed on the report to the court. The phone call lasted 15 minutes. It is

quite evident that the attorneys in this case made it their routine practice to advise their clients of the elements of the crime and to distinguish and explain the degrees of a crime. In addition, the entire thrust of the defense was that the defendant acted out of anger and passion, therefore negating a charge of first or second degree murder. The defense argued to the jury that this was a case of manslaughter, not first degree murder, and in opening statements counsel emphasized that there was no premeditation, intent to kill or malice. The defendant's attorneys were competent trial attorneys, and we can only assume that the arguments they presented to the jury were the same ones they made to their client in the private conferences and the mock dry runs that every trial attorney experiences. Looking at all these circumstances, we find that the defendant was informed of the nature of second degree murder. Even though this court finds no express, specific representation, we do find this to be a case where the "defense counsel routinely explain the nature of the offense in sufficient detail to give the accused notice of what he is being asked to admit." *Henderson, supra,* at page 647.

For the foregoing reasons, the judgment of the Court of Appeals is reversed.

*Judgment reversed.*

CELEBREZZE, C. J., W. BROWN, P. BROWN, SWEENEY, LOCHER and HOLMES, JJ., concur.

HERBERT, J., concurs in the judgment.