[Cite as *State v. Billenstein*, 2014-Ohio-255.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## MERCER COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,               CASE NO.  10-13-10

    v.

RYAN J. BILLENSTEIN,               O P I N I O N

    DEFENDANT-APPELLANT.

Appeal from Mercer County Common Pleas Court
Trial Court No. 12-CRM-100

Judgment Affirmed in Part, Reversed in Part and Cause Remanded

Date of Decision:   January 27, 2014

APPEARANCES:

    *Robert J. Huffman, Jr.* for Appellant

    *Matthew K. Fox*  for Appellee

**ROGERS, J.**

{¶1} Defendant-Appellant, Ryan Billenstein, appeals the judgment of the Court of Common Pleas of  Mercer County finding him guilty of two counts of aggravated vehicular manslaughter, one count of vehicular assault, and one count of operating a vehicle while under the influence of alcohol and/or drugs and sentencing him to 13 years in prison.  On appeal, Billenstein contends that the trial court erred by: (1) failing to suppress in-custody statements Billenstein made; (2) failing to orally advise Billenstein that counts one, two, and five of the indictment carried a mandatory term of incarceration; (3) failing to orally advise Billenstein that he would be ineligible for community control and judicial release; (4) failing to advise Billenstein of the elements of post release control; (5) failing to advise Billenstein of the mandatory suspension of his operator's license; and (6) imposing consecutive sentences.  Billenstein also argues that he was denied effective assistance of counsel.  For the reasons that follow, we affirm in part and reverse in part the trial court's judgment.

{¶2} On August 16, 2012, the Mercer County Grand Jury indicted Billenstein on two counts of aggravated vehicular homicide in violation of R.C. 2903.06(A)(1)(a);(B)(1)(2)(a), felonies of the second degree; two counts of aggravated vehicular homicide in violation of R.C. 2903.06(A)(2)(a);(B)(1)(3), felonies of the third degree; one count of aggravated vehicular assault in violation

of R.C. 2903.08(A)(1)(a);(B)(1), a felony of the third degree; one count of vehicular assault in violation of R.C. 2903.08(A)(2)(b);(C)(1)(2), a felony of the fourth degree; one count of operating a vehicle while under the influence of alcohol and/or drugs of abuse in violation of R.C. 4511.19(A)(1)(a);(G)(1)(a)(i), a misdemeanor of the first degree; one count of operating a vehicle while under the influence of alcohol and/or drugs of abuse in violation of R.C. 4511.19(A)(1)(b);(G)(1)(a)(i), a misdemeanor of the first degree; and one count of operating a vehicle while under the influence of alcohol and/or drugs of abuse in violation of R.C. 4511.19(A)(1)(j)(vii);(G)(1)(a)(i), a misdemeanor of the first degree. The indictment arose from Billenstein's alleged involvement in a single vehicle accident, which resulted in the death of two individuals and seriously injured another.

*Billenstein's Motion to Suppress*

{¶3} On October 9, 2012, Billenstein filed a motion to suppress "the arrest and observations of the officer" arguing that the officer did not have reasonable suspicion upon which he could stop and detain Billenstein. Billenstein's motion also moved the trial court to suppress the results of Billenstein's blood test. Billenstein argued that the blood was not drawn within two hours of him "operating a motor vehicle; an alcohol substance may have been used as an antiseptic; the blood was not drawn with a sterile, dry needle into a vacuum

-3-

container with a solid anti-coagulant or according to laboratory protocol, nor was the solution nonvolatile and aqueous." (Docket No. 21, p. 1-2). Billenstein also argued that the blood was not kept in a tamper proof container, did not contain the name of the suspect, the date and time of collection, or the initials of the person collecting the sample. Lastly, Billenstein argued that his blood was not refrigerated while stored, kept for one year after the date of the incident, and not collected by qualified personnel as defined in R.C. 1547.11.

{¶4} Billenstein filed an amended motion to suppress on October 17, 2012. Billenstein reiterated his contentions from his first motion to suppress and also argued for the trial court to suppress his urine test and any statements Billenstein made before he was read his *Miranda* rights.

{¶5} On November 29, 2012, a suppression hearing was held and the following relevant evidence was adduced.

{¶6} The first witness for the State was Marianne Bruns, a medical laboratory scientist at Mercer Health Community Hospital ("Mercer Health"). Bruns testified that it is her job to collect and analyze blood, urine, stool, and sputum specimens. Bruns testified that she was working on July 14, 2012, when Billenstein was brought to Mercer Health. Bruns explained that a police officer asked her to perform a legal alcohol specimen on Billenstein and handed her the

appropriate paperwork and kit. Bruns remembered the officer reading Billenstein's *Miranda* warnings before she took any specimens from Billenstein.

{¶7} Bruns also testified that she asked Billenstein whether he was consenting to the legal alcohol draw and Billenstein replied that he was. Bruns drew Billenstein's blood at 4:45 a.m., and Billenstein subsequently filled out the consent form, which was offered into evidence as State's Exhibit C. Bruns then testified as to the procedure she followed to draw Billenstein's blood.

> A: I got the kit from the officer. I reviewed the paperwork a little bit, and then I checked the tube that the blood is to be drawn in, made sure it was not expired. It was not. Then I went ahead and got my supplies ready which would be my needle, my sterile needle – it's called a needle pro. It's what the needle actually goes into – my tourniquet, my gauze, and my iodine and my tape I use to secure the gauze after the draw is over.
>
> * * *
>
> A: I went ahead and tied the tourniquet on the patient; cleaned the arm with iodine; let the iodine dry a little bit. Then I went ahead and made the venipuncture, put the tube provided by the officer into the apparatus. The blood filled the tube. Took the tube off. I took the tourniquet off, took the needle out of the arm, put pressure on the arm, asked the patient to continue to put pressure where the venipuncture site was. And then I labeled the tube with the patient's name and birthday, the date and time of draw, and my initials. Then I sealed the tube with the seals provided in the kit – or with the seal. Just one. Labeled that with the patient's name, date of birth, my initials, and the date and time of the draw. And I gave that tube to the officer.
>
> * * *

Q:    Before retrieving the sample, you've already told us this is Mr. Billenstein in the courtroom.  What did you do consistent with your policy and procedure to ID the subject that you were going to draw?

A:    I asked him for his name and date of birth.

Q:    Okay.  Was he wearing a band at all?  Was he a patient?

A:    Yes, yeah, I checked that.

Q:    So you did at least two things then?

A:    Yes.

Suppression Hearing Tr., p. 13-16.

{¶8} The State and Bruns then had the following exchange:

Q:    * * * Ma'am, did you use an aqueous solution of nonvolatile antiseptic on the skin for preparation purposes?

A:    Correct.

Q:    Did you use alcohol to prepare the skin for the draw?

A:    No.

Q:    Did you draw the blood with a sterile needle?

A:    Yes.

Q:    Was that into a vacuum container?

A:    Yes.

Q:    Did that container contain a solid anticoagulant?

A:    Yes.

Q:    Was it drawn according to your lab protocol?

A: Yes.

Q: With regard to the collection of blood, did you seal them in a manner such that tampering could be detected?

A: Yes.

Q: And did you label them?

A: Yes.

Q: Did the label include the name of the suspect?

A: Yes.

Q: Did it include the date and time of collection?

A: Yes.

Q: Did it have the name or initials of yourself as the collecting person?

A: Yes, my initials.

Q: Did you also have the name or initials of the person sealing the sample?

A: Yes, that would be me.

*Id*. at p. 17-18.

{¶9} After Bruns had drawn Billenstein's blood, the officer informed her that he also wanted a urine sample from Billenstein. Bruns then testified that, according to the procedures she is required to follow, she taped off all the water sources in the bathroom with evidence tape and also put toilet bluing in the toilet

water. Bruns then retrieved Billenstein, brought him into the bathroom, and handed him the urine cup. At 5:05 a.m., Billenstein went into the bathroom, alone, and urinated into the cup. After he came out, Bruns checked the temperature strip, recorded it, and then labeled the urine specimen in the same manner as the blood specimen. She then sealed the urine specimen and gave it the officer.

{¶10} The State and Bruns then had the following exchange:

Q: * * * Was the urine deposited into a clean glass or plastic screw-top container?

A: Yes.

Q: Was it capped?

A: Yes.

Q: Did you actually witness the sample being drawn?

A: Being put into the container, no.

Q: But you did follow your lab protocol?

A: Yes.

Q: And with regard to the container itself, did you seal it in such a manner that tampering could be detected?

A: Yes.

Q: Did you seal it with a label that contained the name of the suspect?

A: Yes.

Q: The date and time of collection?

A:   Correct.

Q:   The name or initials of yourself as the collect?

A:   Yes.

Q:   And the name or initials of yourself as the person sealing the sample?

A:   Yes, yes.

*Id.* at p. 21.

{¶11} Bruns testified that Billenstein did not sign an additional consent form for the urine sample. However, Bruns stated that Billenstein did not object to her collection of his urine sample in any way.

{¶12} On cross-examination Bruns testified that she does not remember specifically asking Billenstein whether he consented to giving a urine sample. She also testified that Billenstein signed his name on the consent form for the blood specimen at 5:00 a.m. However, she admitted that she drew Billenstein's blood at 4:45 a.m. Bruns explained that she received Billenstein's verbal consent before she drew his blood. After she was finished collecting Billenstein's blood sample, she had Billenstein sign the form.

{¶13} The next witness to testify for the State was Deputy Darrell Etgen. Deputy Etgen testified he is employed with Mercer County as a patrol deputy and was on duty July 14, 2012. Deputy Etgen testified that he heard Lieutenant

Westgerdes get dispatched to a car accident at 118 and Lange Road around 2:58 a.m. He went to that location to assist Lieutenant Westgerdes and when he arrived was told to go to Mercer Health to try to get a blood sample from Billenstein.

{¶14} While at the hospital, Deputy Etgen called Lieutenant Westgerdes on the phone and asked if he needed to read the BM 2255 form[1] to Billenstein. Deputy Etgen explained that a BM 2255 form is the form police officers read to all suspected OVIs or impaired drivers when they have probable cause. Deputy Etgen testified he did not read the BM 2255 form because, at that time, no one suspected that Billenstein was under the influence of alcohol. Deputy Etgen also testified that Billenstein was not under arrest when he asked for a blood and urine specimen.

{¶15} Deputy Etgen then entered Billenstein's hospital room with Bruns and Officer Speckman. After reading Billenstein's *Miranda* warnings, Deputy Etgen asked Billenstein for a voluntary sample of blood. Billenstein agreed, and the lab technician drew his blood. Deputy Etgen then got a phone call from Lieutenant Westgerdes who advised Deputy Etgen that they needed Billenstein's "consent to search and * * * a voluntary urine sample." *Id*. at p. 51. Deputy Etgen informed the lab technician that he would also need a urine sample. While the lab technician was getting things ready for the urine sample, Deputy Etgen told

---

[1] A BM 2255 form is also known as an implied consent form.

Billenstein that "he was still Mirandized, and [Deputy Etgen] asked [Billenstein] if he would give a consent to search for a urine sample." *Id.* at p. 51-52. Billenstein then agreed to give a urine sample.

**{¶16}** After Billenstein gave his urine sample, Deputy Etgen left the hospital with the blood and urine specimens and went to the Sheriff's Office where he placed the specimens in a refrigerator in the locked evidence lab. Deputy Etgen testified that he never placed Billenstein under arrest on July 14, 2012.

**{¶17}** On cross-examination, Deputy Etgen testified to the following:

Q:   I understand he was not under arrest at that point?

A:   No, he was not.

Q:   You never placed him under arrest –

A:   No, I did not.

Q:   -- on the 14th of July?

A:   No, I did not.

Q:   Okay. In your estimation was Mr. Billenstein when you walked in to read him his *Miranda* rights, if he said I want to leave, was he free to leave at that point?

A:   Sure he was.

Q:   And you wouldn't have stopped him at that point in time?

A:   (The witness shook his head.)

Q: Is that no, sir? You shook your head.

A: Oh, I'm sorry. No, no, I could not have stopped him if he wanted to leave.

*Id.* at p. 59.

{¶18} Deputy Etgen then testified that he did not obtain Billenstein's written consent on any form the morning of July 14, 2012.

{¶19} The State then called Officer Dan Speckman to testify. Officer Speckman testified that he works for the Coldwater Police Department and was on duty the morning of July 14, 2012. Deputy Etgen had requested assistance from Officer Speckman and Officer Powell at Mercer Health that morning. Officer Speckman arrived before Deputy Etgen and Billenstein.

{¶20} Officer Speckman testified that he was familiar with Billenstein because earlier in the night, Officer Powell had made a traffic stop and Billenstein was the driver. Officer Speckman testified that Billenstein was very upset. Officer Speckman also testified:

A: Yes, I spoke with [Billenstein]. But while there, he was very upset. He continued to say that he felt as though he had killed his friend Vincent and was crying, very upset about the matter.

Q: Were those statements in response to any questioning you were giving, or how were those statements being made?

A: He was making those statements while laying [sic] in the gurney. Like, he was screaming out to anybody and everybody in the room.

-12-

* * *

Q: But again, did you ask any questions of him?

A: I asked him if he had been drinking tonight. He advised that he had been.

Q: And that's before Etgen gets there?

A: What's that?

Q: That's before Deputy Etgen arrives?

A: Yes. Yes, sir.

Q: Other than that, any other questions you asked?

A: I asked him how fast he was going when he made the turn because he kept on saying that he was driving too fast and so forth. And in response to that, I asked him how fast he had been driving, and he said he was at least doing over 80 miles per hour.

Q: Both of those questions about how fast were you going or did you have anything to drink, did you initiate those conversations or were those in response to statements he was making?

A: Those were more in response to what he was making statements of. Because like I said, he was very upset, screaming, yelling, that sort of things [sic]. So it was me asking him questions trying to calm him down and trying to get it so that he could receive some treatment with the nurses because the nurses were having some trouble trying to get the I.V. in and treat the burns on his arms.

*Id*. at p. 65-67.

{¶21} Officer Speckman testified that Billenstein was not under arrest at that time and also testified that he did not give Billenstein his *Miranda* warnings. However, Officer Speckman did confirm that Deputy Etgen gave Billenstein his

*Miranda* warnings after arriving at the hospital. He also confirmed that Billenstein gave his verbal consent for a blood and urine sample.

{¶22} On December 21, 2012, the State filed its response to defendant's motion to suppress. On January 14, 2013, the trial court issued a judgment entry denying Billenstein's motion to suppress. The trial court found that Billenstein knowingly, intelligently, and voluntarily agreed to submit to a blood draw. It further found that the collection of blood and urine was made within two hours of the crash that occurred sometime near 2:58 a.m. The trial court also noted that Bruns secured both specimens from Billenstein in accordance with statutory and administrative code requirements. Lastly, the trial court found that there was no actual or constructive seizure of Billenstein, and as a result, any statements Billenstein made to Officer Speckman were admissible.

*Change of Plea Hearing*

{¶23} On March 27, 2013, the trial court conducted a change of plea hearing. At this hearing Billenstein expressed his intent to withdraw his previous not guilty pleas and enter no contest pleas to counts I, II, V, and VII of the indictment. The trial court then had the following relevant exchange with Billenstein:

> Trial Court: Now the maximum penalty for each of these offenses needs to be stated to you here in these proceedings. For each of the first two charges, counts one and two, of aggravated vehicular homicide, the maximum penalty is eight years in prison; fines

totaling $15,000; and the court *could* revoke your right to drive a motor vehicle in the State of Ohio for life. Do you understand that?

Billenstein: Yes, your Honor.

Trial Court: For the fifth count of the indictment, the aggravated vehicular assault charge, the maximum penalty is 60 months in prison, or in effect five years' a $10,000 fine; and the court *must* suspend your operator's license to drive a motor vehicle in the State of Ohio for two years and can do so for up to ten. Do you understand that?

Billenstein: Yes, sir.

Trial Court: And for the first degree misdemeanor charge of operation of a motor vehicle while under the influence of alcohol or drugs of abuse, as contained in count seven of the indictment to which you've tendered this no contest plea, the maximum penalty is six months in jail, three days of which are mandatory unless you complete a driver's intervention course which would void the necessity of the mandatory three days; a fine of $1,075, $375 of which is mandatory; and the court could suspend your right to drive a motor vehicle in the State of Ohio for a minimum of six months up to three years. Do you understand the maximum penalties involved for this charge contained in count seven?

Billenstein: Yes, sir.

* * *

State: If I could just have one moment, your Honor. Your Honor, just one detail before proceeding. I would ask the court if it would please advise the defendant of the mandatory component of post-release control at this time.

Trial Court: With regard to?

State: I believe it would apply to counts one and two and also count three because of physical harm – or counts one and two and count five. It would apply on all those, I believe.

Trial Court:  For a period of?

Bailiff:  Three years.

Trial Court:  Three years.  Mr. Billenstein, you've acknowledged what the prison term could be under each offense.  If you are sentenced to prison on counts one and two or, for that matter, on count three –

State:  Five.

Trial Court: -- or five – excuse me – the aggravated vehicular homicides and the aggravated vehicular assault charge, there is a provision in the law that provides when you complete those sentences, you are subject to a mandatory period of supervision by the Adult Parole Authority called post-release control.  And without going into the terms of that post-release control that they're in charge of, or that agency is in charge of, if you violate the terms of post-release control during that mandatory period of three years for any of those offenses, you can be returned to prison for up to one-half of the prison term imposed for that offense.  Do you understand that?

Billenstein:  Yes, your Honor.

(Emphasis added.)  Change of Plea Hearing Tr., p. 8-11.

{¶24} The State then read the stipulated facts into the record.  Billenstein provided the trial court with a written plea agreement, with his signature, and also executed a written waiver of his constitutional rights in front of the trial court. The trial court accepted Billenstein's no contest pleas for the four charges and found Billenstein guilty on each charge.  The trial court ordered a presentence investigation report and scheduled sentencing for May 1, 2013.

**{¶25}** The plea agreement which Billenstein signed stated, in relevant part:

Maximum Fine:  Ct. 1 and 2 - $15,000, Ct. 5 – $10,000, Ct. 7 - $1,075.

Mandatory Fine:  $375

Maximum O.L. Sanctions:  Life

Prison term is **mandatory**/consecutive: yes

* * *

I understand that if I am now on felony probation, parole, under a community control sanction, or under post release control from prison, this plea may result in revocation proceedings and any new sentence could be imposed consecutively.  I know any prison term stated will be served without good time credit.

**POST RELEASE CONTROL.**  In addition, a period of supervision by the Adult Parole Authority after release from prison may be mandatory in this case.  * * * If I violate conditions of supervision while under post release control, the Parole Board could return me to prison for up to nine months for each violation, for a total of ½ of my originally stated prison term.  If the violation is a new felony, I could receive a prison term of the greater of one year or the time remaining of post release control, in addition to any other prison term imposed for the offense.

(Emphasis sic.)  (Docket No. 49, p. 3).

*Sentencing Hearing*

**{¶26}** This matter proceeded to sentencing on May 1, 2013.  The court made the following findings pursuant to R.C. 2929.12:

Trial Court:  In this case the court finds the following sentencing factors appear to apply based on the information contained in the presentence investigation report.  First, that the victim suffered

-17-

serious physical, psychological, and economic harm, and at least with one of the victims, the offender's relationship facilitated the offense.

The court further finds with regard to the likelihood of recidivism that Mr. Billenstein has no record of being adjudicated as a delinquent child and has indicated some degree of remorse during the course of the presentence investigation. The court would note that with regard to some prior offenses, they involved a prior OVI as well as some speeding traffic offenses, and at least the OVI would be quasi-criminal offense, and therefore there is no finding that he did not have any criminal offense, but that is the extent of his prior criminal activity.

Sentencing Hearing Tr., p. 4.

{¶27} The trial court acknowledged receipt of numerous letters from friends, family members, and members of the community in support of Billenstein. It acknowledged receipt of letters from the victims and victim's representatives. Billenstein then made a statement to the trial court. Billenstein stated:

I wanted to take this time to tell the families of Craig and Vincent how deeply and truly sorry I am for what has happened. There has not been a day that's went by that I haven't thought about the pain and suffering that you've had to go through. Please know that I pray for you all every day that God may help heal the hole left in your hearts from the tragic loss of these young men. I also wanted Bethany to know how sorry I am for the pain that she has been through, both physical and emotional, and I pray that she is fully healed. I hate that she had to be a part of this horrible tragedy, but I thank God that her life was spared.
* * * I just wanted you to know how sorry I am. I'm still brought to tears when I think about that night and the bad decisions that I made that caused these two young men to lose their lives. * * * I did not deserve to walk away from the accident when they didn't. * * * I will share this story with anyone who will listen so that they may hopefully prevent this from happening to someone else. I

-18-

understand that there must be consequences for my mistakes, and I stand before you to accept responsibility for my actions.

*Id*. at p. 6-8.

{¶28} Next, Gary Galvert, Vincent Gragorce's brother, made a victim impact statement. Galvert stated, in relevant part:

His pictures offer little comfort, only tears and the yearning for his voice and presence. We have left his cell phone line open so that we may call him just to hear his voice or the leave a tearful message. That, too, will be gone soon.

Our family is crushed by his death, as are his nieces and nephews who loved him dearly. All of the counseling, prayers, and well wishes have not lifted our heavy hearts. * * *

Our hearts ache; our eyes burn from the tears; and the sleepless nights go on. We hope we can find some meaning in the senseless death of our beloved son and brother.

*Id*. at p. 9-10.

{¶29} Tracy Gengler, the mother of Craig Gengler, then spoke. Tracy stated:

* * * Not only did I lose a child that day, I had extra worry on my mind about my other children that were traveling and pregnant and just back from deployment, that they would be safe, and also for my sons that were there with me.

I had to quit my job towards the end of the year. I couldn't work seven days a week and 12 hours every other day anymore, crying at work all the time and being through two doctors and two counselors. I stay at home most of the time and don't talk to many people, including my kids. Losing my son has ripped the floor out from under me. I found myself pushing my other children away because I guess part of me is thinking that if I don't stay close, then if I lose another, then it won't hurt so bad. I know that's wrong, but I find myself doing it anyways. * * *

I'm not trying to take another child away from their parents or a father away from his children. Mr. Billenstein made the choices freely. He has been taking people on these rides for years, taking people's lives in his hands for years. He felt untouchable by the law and death or injury. He had numerous times that night to change the path he chose to take. * * *

I believe he should have to do the full sentence. He would still have visits, phone calls, and eventually freedom. Craig, myself, and his siblings all got a life sentence.

*Id.* at p. 11-14.

{¶30} Craig's father, Bill Ross, was the next person to give a victim impact statement. He stated:

At 5:50 in the morning on July 14th, I answered the front door of my home to two Darke County sheriffs. My life has never been the same since.

I cannot describe the pain of being told that your child is gone; the pain of seeing your child cold and lifeless on a table; the pain of seeing him in a casket or picking out his headstone. It's a pain I do not wish on anyone. * * *

At times, overwhelming pain is often followed by deep-seated anger. This was not an accident. An accident is an incident that happens unexpectedly and unintentionally. It may have been unexpected, but the high rate of speed and every other act of the early hours that morning were intentional. When you're pulled over by an officer of the law and released with a warning, count your blessings and drive right.

However, Mr. Billenstein takes off with total disregard for the officer's warning and continues to drive recklessly and without regard to anyone else's safety or well-being. * * *

This has put a strain on my marriage, my faith, and my work and my friendships. It seems like every moment of my life is an endless and emotional roller-coaster ride. * * *

I feel Ryan Billenstein should get the maximum penalty for his crimes. Even with the maximum sentence, he will still be able to have a relationship with his sons.

-20-

*Id*. at p. 15-17.

{¶31} The State then spoke at the sentencing hearing. The State argued for a prison sentence and highlighted the fact that Billenstein was given a warning about his erratic driving by the Coldwater Police Department shortly before the fatal car crash. The State also pointed out that Billenstein had a blood alcohol level of .110 and 297 nanograms per milliliter of marijuana metabolite at the time of the crash. The State then highlighted Billenstein's criminal record.

> When we look at [Billenstein's] prior juvenile and adult history, he has a reckless operation in 2002; speed violation in 2003; an OVI in 2003; three separate speed violations in 2005; a speed violation in 2006; two separate speed violations in 2007; three separate speed violations in 2008; four speed violations separately in 2010; and other assorted offenses – traffic control device, et cetera [sic]. So we know from those objective facts the defendant's penchant to drive fast and take his life and others into his own hands.

*Id*. at p. 20.

{¶32} The trial court then announced its sentence. It stated, in relevant part:

> [A] prison sentence is certainly consistent with the purposes and principles of Ohio Revised Code Section 2929.11 and generally the purposes of sentencing to punish the offender and protect the public.
> It will therefore be the sentence of the law and judgment of this court that the defendant serve the mandatory terms of five years with the Ohio Department of Rehabilitation and Correction on each of counts one and two, the aggravated vehicular homicide charges, and that he understand[s] that those are mandatory in nature. He's not subject to early release but must serve the entire periods of incarceration hereby ordered as five-year definite sentences; and in additional to that, he serve a definite prison term of 36 months * * *

> for the offense of aggravated vehicular assault, the third degree felony.
>
> These, the court finds, are ordered to be served consecutively as a result of these crimes being ones that are multiple in nature, and the harm committed was so great or unusual that no single prison term for the offenses as a whole should be imposed by the court consistent with the seriousness of the defendant's conduct bringing about the results of this criminal activity.

*Id*. at p. 22. Billenstein was also sentenced to six months in jail for operating a vehicle while under the influence of alcohol and/or drugs. This sentence was to run concurrently with his 13 year sentence. Finally, the trial court imposed a lifetime suspension of Billenstein's driver's license.

{¶33} Billenstein filed this timely appeal, presenting the following assignments of error for our review.

### Assignment of Error No. I

**THE TRIAL COURT ERRED BY FAILING TO SUPPRESS IN-CUSTODY STATEMENTS OF APPELLANT MADE TO OFFICER SPECKMAN IN THE EMERGENCY ROOM.**

### Assignment of Error No. II

**THE TRIAL COURT ERRED BY FAILING TO ADVISE THE APPELLANT THAT COUNTS ONE, TWO, AND FIVE OF THE INDICTMENT REQUIRED A MANDATORY TERM OF INCARCERATION.**

### Assignment of Error No. III

**THE TRIAL COURT ERRED BY FAILING TO ORALLY ADVISE THE APPELLANT HE WOULD BE INELIGIBLE FOR COMMUNITY CONTROL AND JUDICIAL RELEASE.**

*Assignment of Error No. IV*

**THE TRIAL COURT ERRED BY FAILING TO ADVISE THE APPELLANT REGARDING THE ELEMENTS OF POST RELEASE CONTROL.**

*Assignment of Error No. V*

**THE TRIAL COURT ERRED BY FAILING TO ADVISE THE APPELLANT REGARDING THE MANDATORY OPERATOR'S LICENSE SUSPENSIONS.**

*Assignment of Error No. VI*

**THE TRIAL COURT ERRED BY IMPOSING CONSECUTIVE SENTENCES CONTRARY TO LAW.**

*Assignment of Error No. VII*

**THE APPELLENT [SIC] RECEIVED INEFFECTIVE ASSITANCE [SIC] OF COUNSEL AT THE TRIAL COURT BECAUSE HIS COUNSEL FAILED TO INCLUDE IN THE MOTION TO SUPPREESS [SIC] A BRANCH RELATING TO THE VIOLATION OF APPELLANT'S *MIRANDA* RIGHTS AND THE INVALIDITY OF APPELLANT'S SUBSEQUENT CONSENT FOR A BLOOD AND URINE SAMPLE[.]**

{¶34} Due to the nature of the assignments of error, we elect to address Billenstein's second, third, and fourth assignments of error together.

*Assignment of Error No. I*

{¶35} In his first assignment of error, Billenstein argues that the trial court erred when it overruled his motion to suppress the statements he made to Officer Speckman at the hospital after the accident. Specifically, Billenstein maintains that he was in a custodial interrogation at the time he made the statements and that

he should have been given his *Miranda* warnings. Thus, Billenstein asserts that these statements should have been deemed inadmissible. We disagree.

### Standard of Review

{¶36} "Appellate review of a decision on a motion to suppress presents a mixed question of law and fact." *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, ¶ 8. The trial court serves as the trier of fact and is the primary judge of the credibility of the witnesses and the weight to be given to the evidence presented. *State v. Johnson*, 137 Ohio App.3d 847, 850 (12th Dist. 2000). Therefore, when an appellate court reviews a trial court's ruling on a motion to suppress, it must accept the trial court's findings of facts so long as they are supported by competent, credible evidence. *State v. Roberts*, 110 Ohio St.3d 71, 2006-Ohio-3665, ¶ 100. The appellate court must then review the application of the law to the facts de novo. *Burnside* at ¶ 8.

### Miranda *Standard*

{¶37} A suspect in police custody " must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney, one will be appointed for him prior to any questioning if he so desires. *Miranda v. Arizona*, 384 U.S. 436, 479, 86 S.Ct. 1602 (1966). Absent such a warning, a suspect's statements during a custodial

interrogation are subject to suppression. *State v. Kirk*, 3d Dist. Crawford No. 3-12-09, 2013-Ohio-1941, ¶ 24.

{¶38} "In order to determine whether a person is in custody for purposes of receiving *Miranda* warnings, courts must first inquire into the circumstances surrounding the questioning and, second, given those circumstances, determine whether a reasonable person would have felt that he or she was not at liberty to terminate the interview and leave." *State v. Hoffner*, 102 Ohio St.3d 358, 2004-Ohio-3430, ¶ 27, citing *Thompson v. Keohane*, 516 U.S. 99, 112, 116 S.Ct. 457 (1995). The first inquiry is distinctly factual. *Keohane* at 112. "Once the factual circumstances surrounding the interrogation are reconstructed, the court must apply an objective test to resolve 'the ultimate inquiry' of whether there was a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *Hoffner* at ¶ 27, citing *California v. Beheler*, 463 U.S. 1121, 1125, 103 S.Ct. 3517 (1983), quoting *Oregon v. Mathiason*, 492 U.S. 492, 495, 97 S.Ct. 711 (1977). The subjective views harbored by either the interrogating officers or the person being questioned are of no consequence in the *Miranda* analysis. *Stansbury v. California*, 511 U.S. 318, 323, 114 S.Ct. 1526 (1994). In resolving the ultimate inquiry, courts must consider the totality of the circumstances surrounding the questioning. *State v. Gumm*, 73 Ohio St.3d 413, 429 (1995); *Beheler* at 1125.

{¶39} The trial court denied Billenstein's motion to suppress on the basis that Billenstein was not in custody at the time he made his two statements to Officer Speckman. The trial court found that Billenstein was never placed under arrest and never detained by the police the morning he made his incriminating statements.

{¶40} The record contains competent, credible evidence in support of the trial court's factual findings. At the suppression hearing, Deputy Etgen testified that he was instructed not to read the BM 2255 form because it was not suspected that Billenstein was under the influence of alcohol. Deputy Etgen also testified Billenstein was never placed under arrest. Further, Officer Speckman confirmed that Billenstein was never placed under arrest. Officer Speckman testified that Billenstein made the statements while he was lying on a gurney and shouting for everybody in the room to hear. Both officers testified that after they received Billenstein's blood and urine sample, they left the hospital without Billenstein.

{¶41} Further, both officers testified that Billenstein was not under arrest the morning of July 14, 2012. There was no evidence presented that Billenstein was somehow restrained by the officers. No testimony was offered that either officer had handcuffed Billenstein, closed his hospital room door, or had guards watch over Billenstein in their absence. To the contrary, both officers testified that they left the hospital immediately after obtaining the blood and urine samples.

{¶42} Since the record supports the trial court's factual findings, the only remaining issue is whether the trial court reached the correct legal conclusions based on those findings.

{¶43} Billenstein argues that he was in custody merely because he was involved in a serious accident and knew at least one person had died. Billenstein also argues that "officers from the Coldwater Police Department walked into the hospital with appellant. The Coldwater Police officers were at his side at the time Appellant was questioned." Appellant's Br., p. 10-11. First, we note that Billenstein's contention is unsupported by the record. It is undisputed that Officer Speckman did not walk into the hospital with Billenstein. Instead, Officer Speckman testified he arrived at the hospital *before* Billenstein. Further, the mere presence of a police officer at a hospital does not automatically render any discussion that police officer has with a person a custodial interrogation for *Miranda* purposes.

{¶44} Relevant factors to consider in determining whether a custodial interrogation took place are: (1) the location of the questioning; (2) duration of the questioning; (3) statements made during the interview; (4) the presence or absence of physical restraints; and (5) whether the interviewee was released at the end of the interview. *Howes v. Fields*, 132 S.Ct. 1181, 1189 (2012). Here, Officer Speckman's interview with Billenstein was short in duration, as he only asked

Billenstein two questions. Further, the interview took place in a hospital, and Billenstein was unrestrained the entire time. Lastly, Billenstein was released at the end of the interview as both Officer Speckman and Deputy Etgen left Billenstein alone at the hospital after they collected blood and urine specimens.

{¶45} Therefore, we find that Billenstein was not subject to a custodial interrogation when he answered Officer Speckman's questions.

{¶46} Accordingly, we overrule Billenstein's first assignment of error.

### *Assignments of Error No. II, III, & IV*

{¶47} In his second, third, and fourth assignments of error, Billenstein argues that the trial court erred by failing to orally advise him: that he faced a mandatory term of incarceration; that he would be ineligible for community control and judicial release; and of the elements of post release control. Because of these deficiencies, Billenstein argues his plea was not knowingly, intelligently, and voluntarily made. We disagree.

{¶48} According to Crim.R. 11(C) all guilty and no contest pleas must be entered knowingly, voluntarily, and intelligently. *State v. Engle*, 74 Ohio St.3d 525, 527, 1996-Ohio-179. Crim.R. 11(C) requires the trial judge, before accepting a guilty or no contest plea in a felony case, to inform the defendant of several rights enumerated under the rule, making sure the defendant understands the nature of those rights. *State v. Stewart*, 51 Ohio St.2d 86, 88 (1977). Specifically,

the trial court must determine that the defendant is making the plea voluntarily; that he understands the nature of the charges and the maximum punishment; if applicable, that he understands he is not eligible for probation or community control; that he understands the effect of a no contest plea; and, that he understands by pleading no contest, he is waiving the right to a jury trial, to confront witnesses, to have compulsory process in obtaining witnesses, and to have the State prove his guilt beyond a reasonable doubt at a trial where he is not required to testify against himself. Crim.R. 11(C); *State v. Howard*, 3d Dist. Hardin No. 6-09-16, 2010-Ohio-4828, ¶ 10. A trial court's failure to ensure that a plea has been entered knowingly, voluntarily, and intelligently renders the plea unconstitutional. *Engle*, 74 Ohio St.3d at 527 citing *Kercheval v. United States*, 274 U.S. 220, 223, 47 S.Ct. 582 (1927); Crim.R. 11(C).

{¶49} In determining whether the trial court has properly followed the nonconstitutional requirements of Crim.R. 11(C), the reviewing court must find substantial compliance. *Stewart*, 51 Ohio St.2d at 92. "Substantial compliance means that under the totality of the circumstances the defendant subjectively understands the implications of his plea and the rights he is waiving." *State v. Nero*, 56 Ohio St.3d 106, 108 (1990), citing *State v. Carter*, 60 Ohio St.2d 34, 38 (1979). Additionally, the Supreme Court of Ohio has held that "a defendant must show prejudice before a plea will be vacated for a trial court's error involving

Crim.R. 11(C) procedure when nonconstitutional aspects of the colloquy are at issue." *State v. Veney*, 120 Ohio St.3d 176, 2008-Ohio-5200, ¶ 17. In order to demonstrate prejudice, the defendant must show that the plea would not have been otherwise made. *Steward*, 51 Ohio St.2d at 93.

{¶50} Here, the trial court properly informed Billenstein of the maximum sentence for each charge to which he was pleading no contest. Further, the written plea agreement, which Billenstein signed, stated that a prison term was mandatory. Moreover, at the change of plea hearing, Billenstein stated that he understood the terms of the plea agreement and had no questions regarding the plea agreement. Thus, Billenstein had notice that his prison term was mandatory. *See State v. Lane*, 3d Dist. Allen No. 1-10-10, 2010-Ohio-4819 (substantial compliance with Crim.R. 11 when appellant was not advised at the sentencing hearing he would be subject to post-release control but such requirement was found in the written plea agreement).

{¶51} Since Billenstein was aware of the mandatory nature of his prison sentence, he would have also been aware that he was ineligible for community control. *See State v. Brown*, 11th Dist. Geauga No. 2003-G-2504, 2004-Ohio-1843, ¶ 12 ("[A] defendant who understands that actual incarceration is mandatory necessarily understands that he is ineligible for probation or community control

sanctions and, therefore, cannot demonstrate prejudice as a result of the court's failure to comply literally with the rule.").

**{¶52}** Billenstein also contends that he was never advised that a violation of any post-release control rule or condition can result in a more restrictive sanction and be considered a new felony conviction. We find this argument without merit.

**{¶53}** First, at his change of plea hearing, Billenstein was advised by the trial court, that:

> Trial Court: -- or five – excuse me – the aggravated vehicular homicides and the aggravated vehicular assault charge, there is a provision in the law that provides when you complete those sentences, you are subject to a mandatory period of supervision by the Adult Parole Authority called post-release control. And without going into the terms of that post-release control that they're in charge of, or that agency is in charge of, *if you violate the terms of post-release control during that mandatory period of three years for any of those offenses, you can be returned to prison for up to one-half of the prison term imposed for that offense*. Do you understand that?

(Emphasis added.) Change of Plea Hearing Tr., p. 10-11.

**{¶54}** Further, Billenstein signed a plea agreement, which stated the terms of post release control. Specifically, it stated:

> I understand that if I am now on felony probation, parole, under a community control sanction, or under post release control from prison, this plea may result in revocation proceedings and any new sentence could be imposed consecutively. I know any prison term stated will be served without good time credit.
>
> **POST RELEASE CONTROL.** In addition, a period of supervision by the Adult Parole Authority after release from prison may be

-31-

> mandatory in this case. * * * If I violate conditions of supervision while under post release control, the Parole Board could return me to prison for up to nine months for each violation, for a total of ½ of my originally stated prison term. If the violation is a *new felony, I could receive a prison term of the greater of one year or the time remaining of post release control, in addition to any other prison term imposed for the offense.*

(Emphasis added.) (Docket No. 49, p. 3).

{¶55} Thus, Billenstein was advised that if he were to violate the terms of his post release control, it could result in a new felony conviction and he could be returned to prison for up to one half of the prison term imposed for the offense.

{¶56} Assuming, arguendo, that the trial court did not substantially comply with Crim.R. 11(C), Billenstein does not make any argument that he was prejudiced in any way. Since Billenstein does not even set forth the argument that he would not have pleaded no contest had the trial court more fully complied with Crim.R. 11(C), his second, third, and fourth assignments of error are not well-taken.

{¶57} Accordingly, we overrule Billenstein's second, third, and fourth assignments of error.

### Assignment of Error No. V

{¶58} In his fifth assignment of error, Billenstein contends that the trial court erred by failing to advise him of a mandatory lifetime driver's license suspension. We disagree.

{¶59} Billenstein again argues that the trial court violated Crim.R. 11(C) because it failed to inform him that he was subject to a mandatory lifetime driver's license suspension if he was found guilty of aggravated vehicular homicide. At the change of plea hearing the trial court stated, in regard to counts one and two, that it "*could* revoke [Billenstein's] right to drive a motor vehicle in the State of Ohio for life." (Emphasis added.) Change of Plea Hearing Tr., p. 8. However, when advising Billenstein of the maximum sentence for count five, the trial court correctly stated "the court *must* suspend your operator's license to drive a motor vehicle in the State of Ohio for two years and can do so for up to ten." *Id.*

{¶60} Further, the written plea agreement failed to clarify the trial court's misstatement of the law and actually made the issue of whether a lifetime suspension of Billenstein's operator's license was mandatory more ambiguous. The plea agreement stated:

> Maximum Fine: Ct. 1 and 2 - $15,000, Ct. 5 – $10,000, Ct. 7 - $1,075.
>
> Mandatory Fine: $375
>
> Maximum O.L. Sanctions: Life

(Docket No. 49, p. 3).

{¶61} Thus, while the written plea agreement correctly sets out both the maximum and the mandatory fines in Billenstein's case, it only states the maximum *but not* mandatory suspension of Billenstein's operator's license. Thus, reading these three lines together, it appears as though Billenstein does not have a mandatory operator's license suspension.

{¶62} This case is distinguishable from *State v. Schultz*, 5th Dist. Fairfield No. 12 CA 24, 2013-Ohio-2218, and *State v. Green*, 10th Dist. Franklin No. 10AP-934, 2011-Ohio-6451, where substantial compliance was found where the trial court, at the change of plea hearing, failed to inform the defendants of the mandatory nature of the lifetime operator's license suspension, yet the plea agreements, which the defendants signed, informed them of the mandatory suspension.

{¶63} Since the trial court never advised Billenstein he was subject to a mandatory suspension of his driver's license, we find that the trial court did not substantially comply with the requirements set forth in Crim.R. 11(C). However, Billenstein has not argued prejudice. He never asserts that had he been aware of the mandatory lifetime operator's license suspension he would not have accepted the plea agreement, nor is that assertion reasonable from the record. The record demonstrates that the State offered to nolle prosequi five counts of the indictment in exchange for no contest pleas on the remaining four counts. Further, although

the trial court failed to advise Billenstein that the lifetime operator's license suspension was mandatory, he was well aware it was a possibility and certainly must have contemplated receiving such a sentence before accepting the State's plea agreement. Thus, it is not reasonable that this alone prejudiced Billenstein and that he would not have made his plea agreement had he known of the mandatory suspension.

{¶64} Therefore, while we find that the trial court did not substantially comply with Crim.R. 11(C), Billenstein has failed to demonstrate that he was prejudiced by the trial court's deficiencies.[2]

{¶65} Accordingly, we overrule Billenstein's fifth assignment of error.

### Assignment of Error No. VI

{¶66} In his sixth assignment of error, Billenstein argues that the trial court erred in imposing consecutive sentences. We agree.

{¶67} The revisions to the felony sentencing statutes under H.B. 86 now require a trial court to make specific findings on the record, as set forth in R.C. 2929.14(C)(4), when imposing consecutive sentences. *State v. Hites*, 3d Dist. No. 6-11-07, 2012-Ohio-1892, ¶ 11. Specifically, the trial court must find that (1) consecutive sentences are necessary to either protect the public or punish the offender; (2) the sentences would not be disproportionate to the offense

---

[2] We note that while Billenstein was sentenced to a lifetime suspension of his driver's license, nothing will prevent him from petitioning the trial court in 15 years to reconsider the suspension and grant him limited driving privileges pursuant to R.C. 4510.54.

committed; and (3) one of the factors set forth in R.C. 2929.14(C)(4)(a, b, or c) applies. *Id*. R.C. 2929.14(C)(4)(b) states, "[a]t least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct."

**{¶68}** Billenstein argues that because his alcohol and marijuana levels were "only marginally" over the legal limit and because he has a lifetime operator's license suspension he no longer poses a threat to the public, the imposition of consecutive sentences was unsupported by the record. Whether enough evidence is in the record to support consecutive sentences is not necessary for us to determine here since the trial court did not make the required findings under R.C. 2929.14(C) at the sentencing hearing.

**{¶69}** In regard to consecutive sentences the trial court stated:

These, the court finds, are ordered to be served consecutively as a result of these crimes being ones that are multiple in nature, and the harm committed was so great or unusual that no single prison term for the offenses as a whole should be imposed by the court consistent with the seriousness of the defendant's conduct bringing about the results of this criminal activity.

Sentencing Hearing Tr., p. 22. While, the trial court made the appropriate finding under R.C. 2929.14(C)(4)(b), it did not make the other two necessary findings.[3]

{¶70} As such, we reverse the trial court's imposition of consecutive sentences and remand this matter so that the trial court can make the proper findings, if they so exist, for the imposition of consecutive sentences.

{¶71} Accordingly, Billenstein's sixth assignment of error is sustained.

### *Assignment of Error No. VII*

{¶72} In his seventh assignment of error, Billenstein argues that he was denied effective assistance of counsel because he did not challenge the validity of Billenstein's consent for the blood and urine samples. We disagree.

### *Standard of Review*

{¶73} An ineffective assistance of counsel claim requires proof that trial counsel's performance fell below objective standards of reasonable representation and that the defendant was prejudiced as a result. *State v. Bradley*, 42 Ohio St.3d 136 (1989), paragraph two of syllabus. "To show that a defendant has been prejudiced by counsel's deficient performance, the defendant must prove that there

---

[3] We note that the trial court made the proper findings in its sentencing judgment entry. (Docket No. 59, p. 3). However, Crim.R. 32(C) requires that at the time of imposing a sentence, the court shall "[i]n serious offenses, state its statutory findings and give reasons support those findings, if appropriate." Therefore, it was necessary for the trial court to make the appropriate findings under R.C. 2929.14(C) at the sentencing hearing and in its journal entry. *See State v. Brooks*, 9th Dist. Summit Nos. 26437, 26352, 2013-Ohio-2169, ¶ 13 ("[T]his court concludes that [2929.14(C)] findings must be made at the sentencing hearing on the record. * * * Ideally, those findings would also then be memorialized in the sentencing entry."); *State v. Davis*, 8th Dist. Cuyahoga Nos. 97689, 97691, and 79692, 2012-Ohio-3951, ¶ 8 ("Under R.C. 2929.14(C)(4), the trial court must state its findings in support of consecutives sentences on the record *at the sentencing hearing*.").

exists a reasonable probability that, but for counsel's errors, the outcome at trial would have been different." *Id*. at paragraph three of syllabus. "Reasonable probability" is a probability sufficient to undermine confidence in the outcome of the trial. *State v. Waddy*, 63 Ohio St.3d 424, 433 (1992), *superseded by constitutional amendment on other grounds as recognized by State v. Smith*, 80 Ohio St.3d 89, 103, 1997-Ohio-355.

{¶74} Further, the court must look to the totality of the circumstances and not isolated instances of an allegedly deficient performance. *State v. Barnett*, 3d Dist. Logan No. 8-12-09, 2013-Ohio-2496, ¶ 45. "Ineffective assistance does not exist merely because counsel failed 'to recognize the factual or legal basis for a claim, or failed to raise the claim despite recognizing it.' " *Id*., quoting *Smith v. Murray*, 477 U.S. 527, 106 S.Ct. 2661 (1986).

{¶75} We note that while Billenstein correctly cites to the two-part test that is necessary to show ineffective assistance of counsel, Billenstein's brief is completely devoid of any argument that would show he was prejudiced by his trial counsel's performance or that there is a reasonably probability that but for his trial counsel's performance the result of Billenstein's proceeding would have been different. He merely asserts that, "[a]ny reasonable defense counsel would have raised the issue of the invalidity of the consent for the urine/blood draw of samples

in light of the prior violation of Appellant's Miranda [sic] rights."  Appellant's Br., p. 19.

{¶76} However, Billenstein's statements to Officer Speckman were not made in a custodial interrogation, thus there was no *Miranda* violation.  Further, Officer Etgen did Mirandize Billenstein before obtaining oral consent for the blood and urine specimens.  Thus, it seems unlikely had Billenstein's trial counsel raised the issue of valid consent, that it would have been well-taken by the trial court.  Thus, even if Billenstein had argued prejudice in his brief, his assignment of error would still be meritless.

{¶77} Accordingly, we overrule Billenstein's seventh assignment of error.

{¶78} Having found no error prejudicial to Billenstein in the first, second, third, fourth, fifth, and seventh assignments of error, but having found error prejudicial to Billenstein in the sixth assignment of error, we affirm in part and reverse in part the trial court's judgment and remand this matter for further proceedings consistent with this opinion.

*Judgment Affirmed in Part,*
*Reversed in Part, and*
*Cause Remanded*

**PRESTON and SHAW, J.J., concur.**

**/jlr**