[Cite as *State v. Gideon*, 2019-Ohio-2482.]

## IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## ALLEN COUNTY

STATE OF OHIO,

      PLAINTIFF-APPELLEE,             CASE NO.  1-18-27

      v.

JAMES A. GIDEON,                   O P I N I O N

      DEFENDANT-APPELLANT.

STATE OF OHIO,

      PLAINTIFF-APPELLEE,             CASE NO.  1-18-28

      v.

JAMES A. GIDEON,                   O P I N I O N

      DEFENDANT-APPELLANT.

STATE OF OHIO,

      PLAINTIFF-APPELLEE,             CASE NO.  1-18-29

      v.

JAMES A. GIDEON,                   O P I N I O N

      DEFENDANT-APPELLANT.

Case Nos. 1-18-27, 1-18-28, 1-18-29

---

**Appeals from Lima Municipal Court
Trial Court Nos. 17CRB01386, 17CRB01387, and 17CRB01385**

**Judgments Reversed and Causes Remanded**

**Date of Decision:   June 24, 2019**

---

**APPEARANCES:**

*Dennis C. Belli* **for Appellant**

*Anthony L. Geiger* **for Appellee**

**ZIMMERMAN, P.J.**

**{¶1}** Defendant-appellant, James A. Gideon ("Gideon"), appeals the May 11, 2018 judgment entries of sentence of the Lima Municipal Court.  For the reasons that follow, we reverse.

**{¶2}** This case stems from an investigation of Gideon for allegedly inappropriately touching patients in his capacity as a licensed physician.  As part of the investigation, Sergeant Tyler Hochstetler ("Sergeant Hochstetler") of the Bluffton Police Department criminally investigated the patient complaints, while Investigator Chad Yoakam ("Investigator Yoakam") of the State Medical Board pursued an administrative investigation for possible violations of the statutes and rules governing the practice of medicine.

{¶3} Sergeant Hochstetler and Investigator Yoakam agreed "to cooperate with each other" by trading information during the course of their investigations. (Oct. 13, 2017 Tr. at 51-52). According to Investigator Yoakam, it is advantageous for state investigators to cooperate with law enforcement under "what they call a bootstrap on a criminal case" because proving an administrative-sanction case is easier "from a criminal conviction" as opposed to "through witness testimony." (*Id.* at 15-16). Thus, Investigator Yoakam met with Sergeant Hochstetler "to determine how [he] was going to proceed with the criminal case." (*Id.* at 15). After learning from Sergeant Hochstetler that Gideon denied the patients' allegations to Sergeant Hochstetler, Investigator Yoakam informed Sergeant Hochstetler that he was going to interview Gideon himself. Importantly, Investigator Yoakam warned Sergeant Hochstetler against participating in his interview with Gideon—because Gideon was statutorily obligated to cooperate with his investigation—so that any confession could be used in a criminal proceeding against Gideon. (*See* Oct. 13, 2017 Tr. at 28-29, 55-56); (Defendant's Ex. 4).

{¶4} In accordance with that agreement, Investigator Yoakam arrived unannounced at Gideon's medical office and asked Gideon "if he would have a few minutes to chat with" him to which Gideon—who was aware of his duty to cooperate with Investigator Yoakam's investigation—responded that he did. (Aug. 22, 2017 Tr. at 5). Commensurate with his duty to cooperate and provide truthful

answers to Investigator Yoakam's questions, Gideon provided Investigator Yoakam with an oral and written statement. Thereafter, Investigator Yoakam immediately shared the information from his interview of Gideon with law enforcement "because the doctor had [] an interview with [law enforcement] where he denied any impropriety so I wanted to tell [law enforcement] what happened during [his] interview." (Oct. 13, 2017 Tr. at 26-27).

{¶5} On May 26, 2017, three complaints were filed in the Lima Municipal Court, each charging Gideon with sexual imposition in violation of R.C. 2907.06(A)(1), third-degree misdemeanors. (Case No. 17CRB01385, Doc. No. 3); (Case No. 17CRB01386, Doc. No. 3); (Case No. 17CRB01387, Doc. No. 3). The complaints were assigned case numbers 17CRB01385, 17CRB01386, and 17CRB01387, respectively. (*Id.*); (*Id.*); (*Id.*). Gideon appeared for arraignment and entered pleas of not guilty on June 6, 2017. (Case No. 17CRB01385, Doc. No. 7); (Case No. 17CRB01386, Doc. No. 7); (Case No. 17CRB01387, Doc. No. 7).

{¶6} On July 5, 2017, Gideon filed a motion to suppress evidence. (Case No. 17CRB01385, Doc. No. 10); (Case No. 17CRB01386, Doc. No. 12); (Case No. 17CRB01387, Doc. No. 11). Specifically, Gideon requested that "his written and recorded statements given during an interrogation conducted by [Investigator Yoakam]" be suppressed because "the statements were involuntary and elicited in violation of [Gideon's] right to Due Process and the Privilege against Self-

Incrimination guaranteed under the Fifth and Fourteenth Amendments to the United States Constitution and Article I, Section 10 of the Ohio Constitution." (*Id.*); (*Id.*); (*Id.*). After the conclusion of suppression hearings on August 22, 2017 and October 13, 2017, the trial court determined that Gideon "made voluntary statements during a noncustodial interview" and denied the motion to suppress his statements. (Case No. 17CRB01385, Doc. Nos. 12, 14, 17); (Case No. 17CRB01386, Doc. Nos. 14, 17); (Case No. 17CRB01387, Doc. No. 12, 14). (*See also* Case No. 17CRB01385, Doc. Nos. 14, 15, 16).

{¶7} On February 6, 2018, the State filed a motion to join case numbers 17CRB01385, 17CRB01386, 17CRB01387. (Case No. 17CRB01385, Doc. No. 18).[1] Gideon filed a memorandum in opposition to the State's joinder request on February 23, 2018. (Case No. 17CRB01385, Doc. No. 20). The trial court granted the State's motion on April 9, 2018 and joined all of the cases for trial. (Case No. 17CRB01385, Doc. No. 27A); (Case No. 17CRB01386, Doc. No. 18A); (Case No. 17CRB01387, Doc. No. 15A). (*See* Case No. 17CRB01385, Doc. Nos. 21, 25, 27). (*See also* Case No. 17CRB01385, Doc. No. 22).

{¶8} The cases proceeded to a jury trial on April 18-20, 2018. (Apr. 18, 2018 Tr., Vol. I, at 1); (Apr. 19, 2018 Tr., Vol. II, at 1); (Apr. 20, 2018 Tr., Vol. III, at 1).

---

[1] The State's February 6, 2018 motion requesting joinder also requests the joinder of case numbers 17CRB01711, 17CRB01712, 17CRB01713, and 17CRB01765; however, those cases are not before this court.

The jury found Gideon guilty of the sexual-imposition charge in case number 17CRB01385, 17CRB01386, and 17CRB01387, respectively. (Case No. 17CRB01385, Doc. No. 42); (Case No. 17CRB01386, Doc. No. 22); (Case No. 17CRB01387, Doc. No. 19).

{¶9} On May 11, 2018, the trial court sentenced Gideon to 60 days in jail in case number 17CRB01385, 60 days in jail in case number 17CRB01386, and 60 days in jail in case number 17CRB01387. (Case No. 17CRB01385, Doc. No. 45); (Case No. 17CRB01386, Doc. No. 25); (Case No. 17CRB01387, Doc. No. 22). The jail terms imposed were ordered to be served consecutively for an aggregate sentence of 180 days in jail. (*Id.*); (*Id.*); (*Id.*). The trial court also classified Gideon as a Tier I sex offender. (*Id.*); (*Id.*); (*Id.*).

{¶10} Gideon filed his notice of appeal on May 11, 2018, and raises four assignments of error for our review. (Case No. 17CRB01385, Doc. No. 46); (Case No. 17CRB01386, Doc. No. 26); (Case No. 17CRB01387, Doc. No. 23). Because it is dispositive, we address only Gideon's first assignment of error.

**Assignment of Error No. I**

**The Denial of Defendant-Appellant's Motion to Suppress His Oral and Written Statements to the Medical Board Investigator and the Admission of Those Statements in the State's Case-In-Chief Violated His Rights Under the Fifth and Fourteenth Amendments to the United States Constitution and Article I, Section 10 of the Ohio Constitution. (Apx.A-7)**

**{¶11}** In his first assignment of error, Gideon argues that the trial court erred by denying his motion to suppress oral and written statements that he made to Investigator Yoakam as evidence. In particular, Gideon contends that the trial court erred by concluding that his belief that his statements were coerced was objectively unreasonable under the circumstances. In making that determination, Gideon argues that the trial court "failed to consider the degree to which [Investigator] Yoakam's disciplinary investigation was intertwined with the police department's criminal investigation." (Appellant's Brief at 8).[2]

*Standard of Review*

**{¶12}** A review of the denial of a motion to suppress involves mixed questions of law and fact. *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, ¶ 8. At a suppression hearing, the trial court assumes the role of trier of fact and, as such, is in the best position to evaluate the evidence and the credibility of witnesses. *Id. See also State v. Carter*, 72 Ohio St.3d 545, 552 (1995). When reviewing a ruling on a motion to suppress, "an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence." *Burnside* at ¶ 8, citing *State v. Fanning*, 1 Ohio St.3d 19 (1982). With respect to the trial court's

---

[2] Gideon also argues that the trial court's admission of his involuntary confessions into evidence at trial "was not harmless beyond a reasonable doubt." (Appellant's Brief at 14, citing *Arizona v. Fulimante*, 499 U.S. 279, 295, 111 S.Ct. 1246 (1991)). In other words, Gideon argues that the admission of his involuntary confessions into evidence at trial amounted to structural error. However, based on our conclusion that Gideon's statements should have been suppressed under the Fifth Amendment's privilege against self incrimination, we need not address Gideon's structural-error argument.

conclusions of law, however, our standard of review is de novo, and we must independently determine whether the facts satisfy the applicable legal standard. *Id.*, citing *State v. McNamara*, 124 Ohio App.3d 706 (4th Dist.1997).

*Due Process Voluntariness*

**{¶13}** First, we will address Gideon's argument that his pre-trial statements "were procured in violation of his right to due process * * *." (Appellant's Brief at 5). Separate from the consideration of whether a defendant's statements should be suppressed under the Fifth Amendment's self-incrimination privilege, is the consideration of whether the defendant's statements were voluntary. *See, e.g.*, *Oregon v. Elstad*, 470 U.S. 298, 304, 105 S.Ct. 1285 (1985) ("Prior to *Miranda*, the admissibility of an accused's in-custody statements was judged solely by whether they were 'voluntary' within the meaning of the Due Process Clause."); *State v. Jenkins*, 15 Ohio St.3d 164, 231 (1984) (noting that "due process provisions of the federal Constitution dictate that the state must meet by a preponderance of the evidence its burden of proving that any inculpatory statement was made voluntarily"); *State v. Tussing*, 3d Dist. Logan No. 8-10-11, 2011-Ohio-1727, ¶ 32 (stating that "the Due Process Clause requires an inquiry regarding the voluntariness of a defendant's confession, which is a separate inquiry from the considerations regarding whether a defendant is subject to a custodial interrogation"), citing *State v. Petitjean*, 140 Ohio App.3d 517, 526 (2d Dist.2000), citing *Dickerson v. United*

*States*, 530 U.S. 428, 434, 120 S.Ct. 2326 (2000); *State v. Scholl*, 10th Dist. Franklin No. 12AP-309, 2012-Ohio-6233, ¶ 7 ("The voluntariness of a confession presents 'an issue analytically separate from those issues surrounding custodial interrogations and *Miranda* warnings.'"), quoting *State v. Walker*, 10th Dist. Franklin No. 04AP-1107, 2005-Ohio-3540, ¶ 24, citing *State v. Kelly*, 2d Dist. Greene No. 2004-CA-20, 2005-Ohio-305, ¶ 10. *See also United States v. Goodpaster*, 65 F.Supp.3d 1016, 1021-1022 (D.Or.2014). "Using an involuntary statement against a defendant in a criminal trial is a denial of due process of law." *State v. Carse*, 10th Dist. Franklin No. 09AP-932, 2010-Ohio-4513, ¶ 23, citing *Mincey v. Arizona*, 437 U.S. 385, 398, 98 S.Ct. 2408 (1978). Statements are considered involuntary when, under the totality of the circumstances, the "defendant's will was overborne." *Schneckloth v. Bustamonte*, 412 U.S. 218, 226, 93 S.Ct. 2041 (1973). Some of the circumstances that are commonly considered include the defendant's age, education, intelligence, and knowledge of his rights; the duration and nature of detention and questioning; and whether physical punishment was used or threatened. *Id.*

{¶14} Although Gideon asserts that he is challenging the admissibility of his pre-trial statements under the Due Process Clause, he failed to make any argument in support of that contention. "[A] defendant has the burden of affirmatively demonstrating the error of the trial court on appeal." *State v. Stelzer*, 9th Dist.

-9-

Summit No. 23174, 2006-Ohio-6912, ¶ 7, citing *State v. Cook*, 9th Dist. Summit No. 20675, 2002-Ohio-2646, ¶ 27. "Moreover, '[i]f an argument exists that can support this assignment of error, it is not this court's duty to root it out.'" *Id.*, quoting *Cook* at ¶ 27. "App.R. 12(A)(2) provides that an appellate court 'may disregard an assignment of error presented for review if the party raising it fails to identify in the record the error on which the assignment of error is based or fails to argue the assignment separately in the brief, as required under App.R. 16(A).'" *State v. Jackson*, 10th Dist. Franklin No. 14AP-670, 2015-Ohio-3322, ¶ 11, quoting App.R. 12(A)(2). "Additionally, App.R. 16(A)(7) requires that an appellant's brief include '[a]n argument containing the contentions of the appellant with respect to each assignment of error presented for review and the reasons in support of the contentions, with citations to the authorities, statutes, and parts of the record on which appellant relies.'" *Id.*, quoting App.R. 16(A)(7). Notwithstanding Gideon's failure to include an argument regarding how his pre-trial statements were inadmissible under the Due Process Clause, the voluntariness of his statements are immaterial to the resolution of his suppression argument because we conclude that his statements were otherwise per se compelled under the Fifth Amendment to the United States Constitution.

Case Nos. 1-18-27, 1-18-28, 1-18-29

*Fifth Amendment*

{¶15} "'The Fifth Amendment to the United States Constitution, made applicable to the states by the Fourteenth Amendment, states that "[n]o person * * * shall be compelled in any criminal case to be a witness against himself."'" *State v. Jackson*, 154 Ohio St.3d 542, 2018-Ohio-2169, ¶ 14, quoting *State v. Graham*, 136 Ohio St.3d 125, 2013-Ohio-2114, ¶ 19, quoting the Fifth Amendment to the U.S. Constitution.[3] *See also* Ohio Constitution, Article I, Section 10. "It has long been held that this prohibition not only permits a person to refuse to testify against himself at a criminal trial in which he is a defendant, but also 'privileges him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings.'" *Minnesota v. Murphy*, 465 U.S. 420, 426, 104 S.Ct. 1136 (1984), quoting *Lefkowitz v. Turley*, 414 U.S. 70, 77, 94 S.Ct. 316 (1973).

{¶16} "The privilege against self-incrimination is generally not self-executing; a person 'ordinarily must assert the privilege rather than answer if he

---

[3] Gideon's argument necessarily incorporates the procedural safeguards of the Sixth Amendment. *See State v. Jackson*, 154 Ohio St.3d 542, 2018-Ohio-2169, ¶ 13. (*See also* Appellant's Brief at 13). "'The Sixth Amendment, applied to the States through the Fourteenth Amendment, guarantees that "[i]n all criminal prosecutions, the accused shall * * * have the Assistance of Counsel for his defence."'" *Jackson* at ¶ 16, quoting *Kansas v. Ventris*, 556 U.S. 586, 590, 129 S.Ct. 1841 (2009). "'The core of this right has historically been, and remains today, 'the opportunity for a defendant to consult with an attorney and to have him investigate the case and prepare a defense for trial.'"" *Id.*, quoting *Ventris* at 590, quoting *Michigan v. Harvey*, 494 U.S. 344, 348, 110 S.Ct. 1176 (1990). However, "'[t]hat the right extends to having counsel present at various pretrial "critical" interactions between the defendant and the State, * * * including the deliberate elicitation *by law enforcement officers (and their agents)* of statements pertaining to the charge.'" (Emphasis added.) *Id.*, quoting *Ventris* at 590.

-11-

desires not to incriminate himself.'" *Graham* at ¶ 19, quoting *Murphy* at 429. *See also Murphy* at 427 (noting that "[t]his principle has been applied in cases involving a variety of criminal and noncriminal investigations"). Thus, "[i]f a witness—even one under a general compulsion to testify—answers a question that both he and the government should reasonably expect to incriminate him, the Court need ask only whether the particular disclosure was 'compelled' within the meaning of the Fifth Amendment." *Murphy* at 428.

> There are well-known exceptions to the requirement of asserting the privilege: (1) "custodial interrogation"; (2) situations where the assertion is penalized to an extent that a "'free choice to remain silent'" is foreclosed; and (3) situations where parties fail to file tax returns rather than identifying themselves as gamblers and asserting the Fifth Amendment privilege.

*State v. Schimmel*, 2d Dist. Clark No. 2017-CA-23, 2017-Ohio-7747, ¶ 17, quoting *Murphy* at 429-430, 434, 439, quoting *Garner v. United States*, 424 U.S. 648, 661, 96 S.Ct. 1178 (1976). *See also Goodpaster*, 65 F.Supp.3d at 1022-1023 ("Rather than ask whether statements were actually compelled, a prophylactic rule asks whether certain other conditions were met and provides that statements made under those conditions are deemed per se compelled.), citing *Elstad*, 470 U.S. at 307. "A prophylactic rule, therefore, 'sweeps more broadly than the Fifth Amendment itself' and may exclude even 'patently *voluntary* statements.'" (Emphasis sic.) *Goodpaster* at 1023, quoting *Elstad* at 306-307.

**{¶17}** Here, the trial court addressed two of the exceptions to the requirement of asserting the privilege: the *Miranda* and the *Garrity* rules. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602 (1966); *Garrity v. New Jersey*, 385 U.S. 493, 87 S.Ct. 616 (1967). Accordingly, we will review the trial court's application of the *Miranda* and *Garrity* rules to the facts and circumstances presented by this case.

*Miranda*

**{¶18}** The first well-known exception under *Miranda* excludes "'statements, whether exculpatory or inculpatory, stemming from *custodial interrogation* of the defendant unless [the state] demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination.'" (Emphasis added.) *Jackson*, 154 Ohio St.3d 542, 2018-Ohio-2169, at ¶ 14, quoting *Miranda* at 444. "The basic insight of *Miranda* is that custody contains 'inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely.'" *Goodpaster* at 1023, quoting *Miranda* at 467. "To offset this coercion, *Miranda* mandated that certain warnings be given before a suspect in custody is interrogated." *Id.*, citing *Miranda* at 478-479. "Absent these warnings, * * * a suspect's statements made during custodial interrogation * * * may not be used against him * * *." *Id.*, citing *Elstad* at 307 and *Miranda* at 478-479.

{¶19} "The prophylactic rule of *Miranda*, therefore, substitutes the totality-of-the-circumstances voluntariness inquiry with" a four-prong inquiry: First, was the suspect in custody? Second, was the suspected being interrogated? Third, was the custodial interrogation conducted by law enforcement? Fourth, if the first three inquiries produce an affirmative result, were adequate warnings given? *See id.*

{¶20} A "custodial interrogation" within the meaning of *Miranda* "'means "questioning initiated by *law enforcement* after a person has been taken into custody."'" (Emphasis added.) *Jackson* at ¶ 15, quoting *State v. Watson*, 28 Ohio St.2d 15 (1971), paragraph five of the syllabus, quoting *Miranda* at 444, and citing *State v. Bernard*, 31 So.3d 1025, 1029 (La.2010) (noting that *Miranda* applies only if "the interrogation is conducted by a 'law enforcement officer' or someone acting as their agent"). *See also Rhode Island v. Innis*, 446 U.S. 291, 300-301, 100 S.Ct. 1682 (1980) (defining "interrogation" as "express questioning or its functional equivalent"). "When determining whether an individual is in custody for *Miranda* purposes, we must consider whether there was a formal arrest or the functional equivalent of 'a restraint of an individual's freedom of movement commensurate with that of a formal arrest.'" *In re M.H.*, 8th Dist. Cuyahoga No. 105742, 2018-Ohio-4848, ¶ 20, quoting *State v. Jones*, 8th Dist. Cuyahoga No. 83481, 2004-Ohio-5205, ¶ 39, citing *Miranda* at 444. "In considering whether an individual is in custody for *Miranda* purposes, "courts must first inquire into the circumstances

surrounding the questioning and, second, given those circumstances, determine whether a reasonable person would have felt that he or she was not at liberty to terminate the interview and leave.'" *Id.* at ¶ 24, quoting *State v. Hoffner*, 102 Ohio St.3d 358, 2004-Ohio-3430, ¶ 27, citing *Thompson v. Keohane*, 516 U.S. 99, 112, 116 S.Ct. 457 (1995). "In so doing, we examine the totality of the circumstances and how a reasonable person would have understood the circumstances." *Id.* at ¶ 20, citing *State v. Montague*, 8th Dist. Cuyahoga No. 97958, 2012-Ohio-4285, ¶ 8, citing *Berkemer v. McCarty*, 468 U.S. 420, 442, 104 S.Ct. 3138 (1984). "Relevant factors to consider in determining whether a custodial interrogation took place are: (1) the location of the questioning; (2) duration of the questioning; (3) statements made during the interview; (4) the presence or absence of physical restraints; and (5) whether the interviewee was released at the end of the interview." *State v. Billenstein*, 3d Dist. Mercer No. 10-13-10, 2014-Ohio-255, ¶ 44, citing *Howes v. Fields*, 565 U.S. 499, 132 S.Ct. 1181 (2012).

**{¶21}** However, generally, "[t]he *Miranda* requirements do not apply when admissions are made to persons who are not law enforcement officers or their agents, even if an individual's efforts aid in law enforcement." [4] *In re M.H.* at ¶ 19, citing *Jackson* at ¶ 15. *See also id.* at ¶ 21 ("Generally, courts have held that [state

---

[4] A law enforcement officer is defined under R.C. 2901.01(A)(11)(b) as follows: "An officer, agent, or employee of the state or any of its agencies, instrumentalities, or political subdivisions, upon whom, by statute, a duty to conserve the peace or to enforce all or certain laws is imposed and the authority to arrest violators is conferred * * *."

investigators—namely, social workers—]do not have a duty to advise suspects of their *Miranda* rights because they are private citizens with no power to arrest."), citing *Jones* at ¶ 40, *State v. Coonrod*, 12th Dist. Fayette No. CA2009-08-013, 2010-Ohio-1102, ¶ 9, *State v. Thoman*, 10th Dist. Franklin No. 04AP-787, 2005-Ohio-898, ¶ 7, *State v. Dobies*, 11th Dist. Lake No. 91-L-123, 1992 WL 387356, *3 (Dec. 18, 1992), and *State v. Simpson*, 4th Dist. Ross No. 1706, 1992 WL 37793, *4 (Feb. 21, 1992). Nevertheless, when a state investigator acts as an agent of law enforcement, that investigator may be required to provide *Miranda* warnings. *Id.* at ¶ 22. A state investigator is an agent of law enforcement when he or she acts under the direction or control of law enforcement. *Id.*, citing *State v. Bolen*, 27 Ohio St.2d 15, 18 (1971). Whether an individual is acting as an agent of law enforcement depends on the specific facts and circumstances of each case. *Jackson* at ¶ 17.

**{¶22}** In the case before us, the trial court concluded that suppression of Gideon's statements was not warranted under *Miranda* because Gideon was not in custody. In support of its conclusion that Gideon was not in custody, the trial court found that (1) the interview with Investigator Yoakam was conducted at Gideon's office; (2) Gideon was freely accessible to his staff; (3) Gideon repeatedly left his office to see patients; (4) Gideon was not physically threatened, intimidated, or restrained; and (5) Investigator Yoakam did not dominate the interview. The record reveals that the trial court's findings are supported by competent, credible evidence.

Accordingly, although there may a tenable argument that Investigator Yoakam was acting as an agent of law enforcement, suppression of Gideon's statements under *Miranda* is unavailing. *Compare State v. Kuruc*, 9th Dist. Medina No. 15CA0088-M, 2017-Ohio-4112, ¶ 22 ("concluding that suppression was not warranted under *Miranda* because, "[e]ven assuming that the Fire Chief and/or the other firefighters here were acting as agents of the police when they met with Kuruc, the record does not support his assertion that they subjected him to custodial interrogation). *See also State v. Woods*, 4th Dist. Lawrence Nos. 16CA28 and 16CA29, 2018-Ohio-4588, ¶ 49-50, 52.

*Garrity*

{¶23} "The *Garrity* rule * * * applies when the government threatens to *penalize* the assertion of the Fifth Amendment privilege." (Emphasis added.) *Goodpaster*, 65 F.Supp.3d at 1023. Specifically, the Garrity rule applies "when a person's assertion of the privilege is penalized in a way that precludes that person from choosing to remain silent and compels his or her incriminating testimony." *Graham*, 136 Ohio St.3d 125, 2013-Ohio-2114, at ¶ 20. "For instance, a person need not assert the [self-incrimination] privilege in cases in which the state compels the person to give up the 'privilege by threatening to impose economic or other sanctions "capable of forcing the self-incrimination which the [Fifth] Amendment forbids.""" *Id.*, quoting *Murphy*, 465 U.S. at 434, quoting *Lefkowitz v. Cunningham*,

431 U.S. 801, 806, 97 S.Ct. 2132 (1977). "Where it has threatened to do so, the government has created a 'classic penalty situation,' and any answers given by the suspect are 'deemed compelled and inadmissible in a criminal prosecution.'" *Goodpaster* at 1024, quoting *Murphy* at 435.

**{¶24}** "[T]he constitutional protection 'against coerced statements prohibits use in subsequent criminal proceedings of statements obtained under threat of removal from office, and that it extends to all, whether they are policemen or other members of our body politic.'" *Graham* at ¶ 21, quoting *Garrity*, 385 U.S. at 500. *See Goodpaster* at 1024 (noting that the "'loss of job, loss of state contracts, loss of future contracting privileges with the state, loss of political office, loss of the right to run for political office in the future, and revocation of probation all are "penalties" that cannot be imposed on the exercise of the privilege'"), quoting *United States v. Frierson*, 945 F.2d 650, 658 (3d Cir.1991). *See also Spevack v. Klein*, 385 U.S. 511, 516, 87 S.Ct. 625 (1967) (applying the "classic-penalty-situation" rule to lawyers and noting that "[t]he threat of disbarment and the loss of professional standing, professional reputation, and of livelihood are powerful forms of compulsion to make a lawyer relinquish the privilege"); *Moody v. Michigan Gaming Control Bd.*, 790 F.3d 669, 674 (6th Cir.2015) (applying the rule to state-license holders).

**{¶25}** In classic-penalty-situation cases,

> the government is playing two roles. One role is always law enforcer—police and prosecutor. Often, as in *Garrity*, the second role is employer, but it need not be. The key is that in these second roles, the state has special relationships with certain people—employees, probationers, and so on—through which it can apply additional pressure to cooperate.

*Goodpaster* at 1024-1025.

> Corresponding to these dual roles, the Fifth Amendment principle implemented by *Garrity* can be implicated in two distinct contexts. In the more common scenario, the individual does not succumb to the state's pressure, but stands upon his privilege and maintains his silence; in this context, he appears as a civil plaintiff, seeking to prevent the government—employer from "mak[ing] good on its prior threat" by penalizing him.

*Id.*, quoting *Murphy* at 434. "But sometimes, as in *Garrity* and *Murphy*, the individual succumbs to the pressure and discloses incriminating information; in this context, he appears as a criminal defendant, seeking to prevent the government—prosecutor from using his statements against him." *Id.*, citing *Murphy* at 434.

{¶26} "*Garrity* does not, however, discount the important public interest in obtaining information to ensure effective governmental functioning." *Graham* at ¶ 21, citing *Turley*, 414 U.S. at 81, citing *Murphy v. Waterfront Comm. of New York Harbor*, 378 U.S. 52, 93, 84 S.Ct. 1594 (1964) (White, J., concurring). "Indeed, the United States Supreme Court has recognized that *Garrity* rests on reconciling the recognized policies behind the privilege against self-incrimination and the government's need to obtain information." *Id.*, citing *Turley* at 81. *See also Goodpaster* at 1025, citing *Gardner v. Broderick*, 392 U.S. 273, 276, 88 S.Ct. 1913

(1968) and *Murphy* at 435. "A state may compel a public employee's cooperation in a job-related investigation, so long as the employee is not asked to surrender the privilege against self-incrimination." *Graham* at ¶ 21, citing *Turley* at 84. "For example, the state may compel incriminating answers from its employee if neither those answers nor the fruits thereof are available for use against the employee in criminal proceedings." *Id.*, citing *Turley* at 84 and *Jones v. Franklin Cty. Sheriff*, 52 Ohio St.3d 40, 44 (1990) (stating that a grant of immunity preserves the self-incrimination privilege because no statement made in that context is incriminatory). "But when the state compels testimony by threatening potent sanctions unless the witness surrenders the constitutional privilege, the state obtains the testimony in violation of the Fifth Amendment, and it may not use that testimony against the witness in a subsequent criminal prosecution." *Id.*, citing *Cunningham*, 431 U.S. at 805 and *State v. Jackson*, 125 Ohio St.3d 218, 2010-Ohio-621, ¶ 14 (plurality opinion) (noting that the State may not directly or derivatively use statements that are compelled under threat of termination). "This balance 'provid[es] for effectuation of the important public interest in securing from public employees an accounting of their public trust.'" *Id.*, quoting *Cunningham* at 806.

{¶27} "Compulsion within the meaning of *Garrity* is obvious in cases in which, as in *Garrity*, the state has *expressly* confronted the public employee with the inescapable choice of either making an incriminatory statement or being fired."

(Emphasis added.) *Id.* at ¶ 23. In the absence of an express threat, """"for statements to be considered compelled by threat of discharge, (1) a person must subjectively believe that he will be fired for asserting the privilege, and (2) that belief must be objectively reasonable under the circumstances.""" *Id.*, quoting *State v. Brockdorf*, 291 Wis.2d 635, 2006 WI 76, ¶ 25, quoting *People v. Sapp*, 934 P.2d 1367, 1372 (Colo.1997). "Determining whether an employee's subjective belief was objectively reasonable requires a court to examine the totality of the circumstances." *Id.*, citing *Brockdorf* at ¶ 36. "The circumstances must show some demonstrable coercive action by the state beyond '[t]he general directive to cooperate.'" *Id.*, quoting *United States v. Vangates*, 287 F.3d 1315, 1324 (11th Cir.2002).

**{¶28}** In this case, after concluding that there was no express threat of penalty by Investigator Yoakam, the trial court examined whether Gideon *subjectively* believed that he would be penalized and, if so, whether that belief was *objectively reasonable*. The trial court found that Gideon "testified that he believed he would be penalized" if he did not answer Investigator Yoakam's questions. And, in our review, the trial court's finding is supported by competent, credible evidence because Gideon testified as follows:

> "My understanding is that I have a legal obligation to comply with questions asked by the Medical Board and my understanding was that I have an obligation to comply with Mr. Yoakam's visit subject to penalties if I didn't, potentially even loss of licensure."

(Oct. 13, 2017 Tr. at 72).

-21-

**{¶29}** Nevertheless, the trial court ultimately concluded that Gideon's belief was *not* objectively reasonable based on the totality of the circumstances. Specifically, the trial court found that Gideon,

> a well-educated individual, initiated contact with the investigator, spoke with him at his medical office after already communicating with law enforcement, was given the opportunity to reschedule, took the lead in the discussion throughout, treated/examined patients, and never sought to invoke his Fifth Amendment rights.

(Case No. 17CRB01385, Doc. No. 17); (Case No. 17CRB01386, Doc. No. 17); (Case No. 17CRB01387, Doc. No. 14). Even though the trial court's findings are primarily supported by competent, credible evidence, the trial court's totality-of-the-circumstances analysis necessarily applies to whether Gideon's statements were voluntary within the meaning of the Due Process Clause, or whether his statements should be suppressed under *Miranda*.[5] *See, e.g.*, *Schneckloth*, 412 U.S. at 226 (noting that a court may consider a defendant's age, education, intelligence, and knowledge of his rights; the duration and nature of the detention and questioning; and whether physical punishment was used or threatened to determine whether the defendant's statements were voluntary); *Billenstein*, 2014-Ohio-255, at ¶ 44 (noting that the factors to consider when determining whether a custodial interrogation took

---

[5] The trial court's finding that Gideon "was given the opportunity to reschedule" is not supported by competent, credible evidence. (Case No. 17CRB01385, Doc. No. 17); (Case No. 17CRB01386, Doc. No. 17); (Case No. 17CRB01387, Doc. No. 14). Rather, the record reflects that Investigator Yoakam asked Gideon "if he would have a few minutes to chat with" him, which is different than offering Gideon the opportunity to reschedule. (*See* Oct. 13, 2017 Tr. at 5). (*See also* State's Ex. A). Indeed, Gideon testified that Yoakam did not explicitly offer him the opportunity to reschedule. (Oct. 13, 2017 Tr. at 73).

place includes "(1) the location of the questioning; (2) duration of the questioning; (3) statements made during the interview; (4) the presence or absence of physical restraints; and (5) whether the interviewee was released at the end of the interview").

**{¶30}** In considering the totality of the circumstances as to whether a person was compelled to make statements against his or her own interest within the meaning of *Garrity*—that is, whether the subject's subjective belief that he or she would be penalized for remaining silent was objectively reasonable—a trial court must consider the circumstances surrounding the subject's "'duty to cooperate' and the threat of 'administrative discipline.'" *Goodpaster*, 65 F.Supp. at 1032. *See also Graham*, 136 Ohio St.3d 125, 2013-Ohio-2114, at ¶ 27. As to those circumstances, the trial court specifically found that

> the Board of Medical Examiners may consider a refusal to cooperate with their investigations when reviewing Complaints, this does not necessarily lead to a termination of his medical license. It just may be one of the many considerations taken into account by the Board.

(Case No. 17CRB01385, Doc. No. 17); (Case No. 17CRB01386, Doc. No. 17); (Case No. 17CRB01387, Doc. No. 14). *See* R.C. 4731.22 (Apr. 4, 2017) (current version at R.C. 4731.22 (Mar. 20, 2019)).

**{¶31}** In our view, the trial court did not capture the concept of the statute and, more importantly, failed to consider the *totality* of the circumstances surrounding Gideon's interview with Investigator Yoakam to determine whether suppression is warranted under *Garrity*. Indeed, we cannot turn a blind eye to the

*totality* of the evidence presented at the suppression hearing supporting that Gideon's belief (that he would be penalized if he remained silent) was objectively reasonable. The requirements of R.C. 4731.22 are but one piece of the puzzle.

*R.C. Chapter 4731 and Garrity*

**{¶32}** "R.C. Chapter 4731 provides for the establishment of the State Medical Board and contains provisions concerning the licensing and disciplining of physicians." *State ex rel. Corn v. Russo*, 90 Ohio St.3d 551, 557 (2001). In general, the board "has authority to investigate possible violations of the statutes and rules governing the practice of medicine, to hold hearings, and to share its information with other licensing boards and with law enforcement agencies." 1999 Ohio Atty.Gen.Ops. No. 1999-044, citing R.C. 4731.22(F). *See also* R.C. 4731.22(F)(1) (April 6, 2017) ("The board shall investigate evidence that appears to show that person has violated any provision of this chapter or any rule adopted under it.") (current version at R.C. 4731.22(F)(1) ((Mar. 20, 2019)).. "All investigations that are conducted by the Board are conducted in accordance with R.C. 4731.22 and the rules adopted by the Board under R.C. 4731.05." *State ex rel. Corn v. Russo*, 8th Dist. Cuyahoga No. 76730, 1999 WL 1085519, *8 (Nov. 24, 1999), *rev'd on other grounds*, 90 Ohio St.3d at 557-558.[6] In accordance with those investigations, the

---

[6] This court could not find any administrative rules adopted by the State Medical Board pertaining to the conduct of its investigators during the course of an investigation under R.C. 4731.22. *See* Ohio Adm.Code 4731-1-01, et seq. *But see* R.C. 4731.05(C) (stating that "[t]he state medical board shall *develop requirements for* and provide appropriate initial and continuing training for *investigators employed by the board to carry*

board "is authorized to limit, revoke, or suspend a certificate or otherwise discipline the holder of a certificate who commits any of a number of violations." 1999 Ohio Atty.Gen.Ops. No. 1999-044, citing R.C. 4731.22(A), (B).

{¶33} In particular, regarding the board's disciplinary procedure, R.C. 4731.22(B) provides, in its relevant part, as follows:

> The board, by an affirmative vote of not fewer than six members, shall, to the extent permitted by law, limit, revoke, or suspend an individual's certificate to practice * * * or reprimand or place on probation the holder of a certificate for one or more of the following reasons:
>
> * * *
>
> (11) A plea of guilty to, a judicial finding of guilt of, or a judicial finding of eligibility for intervention in lieu of conviction for, a misdemeanor committed in the course of practice;
>
> (12) Commission of an act in the course of practice that constitutes a misdemeanor in this state, regardless of the jurisdiction in which the act was committed;
>
> (13) A plea of guilty to, a judicial finding of guilt of, or a judicial finding of eligibility for intervention in lieu of conviction for, a misdemeanor involving moral turpitude;
>
> (14) Commission of an act involving moral turpitude that constitutes a misdemeanor in this state, regardless of the jurisdiction in which the act was committed;
>
> * * *

---

*out its duties under Chapter 4731. of the Revised Code.* The training and continuing education may include enrollment in courses operated or approved by the Ohio peace officer training commission that the board considers appropriate under conditions set forth in section 109.79 of the Revised Code.").

(34) Failure to cooperate in an investigation conducted by the board under division (F) of this section, including failure to comply with a subpoena or order issued by the board or failure to answer truthfully a question presented by the board in an investigative interview, an investigative office conference, at a deposition, or in written interrogatories, except that failure to cooperate with an investigation shall not constitute grounds for discipline under this section if a court of competent jurisdiction has issued an order that either quashes a subpoena or permits the individual to withhold the testimony or evidence in issue.

R.C. 4731.22(B)(11)-(14), (34) (Apr. 4. 2017) (current version at R.C. 4731.22(B)(11)-(14), (34) (Mar. 20, 2019)).

{¶34} On appeal, the State argues that the trial court correctly concluded that Gideon's belief that he would suffer a penalty if he remained silent was not objectively reasonable—that is, the State argues that the trial court correctly concluded that Gideon's belief was not objectively reasonable because R.C. 4731.22(B) does not result in an automatic penalty. In support of its argument, the State contends that the word "shall" as used in R.C. 4731.22(B) "does not mandate a medical license revocation, because the statute (1) requires an affirmative vote of six board members; (2) provides limiting language on the board's powers ('to the extent permitted by law'); and, (3) provides a variety of disciplinary options short of revocation." (Emphasis sic.) (Appellee's Brief at 5-6).

{¶35} The State's argument is problematic for a several reasons. The State's argument that Gideon's belief could not be objectively reasonable because R.C. 4731.22(B) authorizes the board to institute a "variety of disciplinary options short

-26-

of license revocation" is misguided. Rather, the disciplinary options authorized by the statute—namely, the authority to limit, revoke, suspend, reprimand, or place on probation the holder of a medical license—are penalties for conduct, such as the failure to cooperate in an investigation, that resemble the "classic penalty situation" prohibited by *Garrity* and its progeny. *See Schimmel*, 2017-Ohio-7747, at ¶ 38 (recognizing that the Supreme Court of Ohio has *not* adopted a "narrow view" of what constitutes a penalty within the meaning of *Garrity*), citing *Graham*, 136 Ohio St.3d 125, 2013-Ohio-2114, at ¶ 27 (considering "disciplinary action up to and including termination" as a penalty within the meaning of *Garrity*). *See also Murphy*, 465 U.S. at 434 ("In each of the so-called 'penalty' cases, the state not only compelled an individual to appear and testify, but also sought to induce him to forgo the Fifth Amendment privilege by threatening to impose economic or other sanctions 'capable of forcing the self-incrimination which the Amendment forbids.'"), quoting *Cunningham*, 431 U.S. at 806 (noting that the Fifth Amendment protects against state-imposed "potent sanctions" or "substantial penalties").

{¶36} Next, suppression under *Garrity* does not fail in the absence of a statute clearly mandating an automatic penalty. *See Goodpaster*, 65 F.Supp. at 1029 (stating that "a clear-statement rule is foreclosed [because] threatening a penalty 'by implication' is sufficient to create a penalty situation"), quoting *United States v. Saechao*, 418 F.3d 1073, 1076-1080 (9th Cir.2005). *See also Graham* at ¶ 25

-27-

(considering a notice, which provided that the "failure to answer truthfully '*may* lead to disciplinary action up to and including termination'"); *United States v. Camacho*, 739 F.Supp. 1504, 1517, 1520 (S.D.Fla.1990) (considering a statute, which provided "that a city employee who is guilty of insubordination *may* be subject to dismissal, suspension, or demotion" when considered in combination with the state's conduct). "[E]vidence of an express threat of termination or a statute, rule, or policy *demanding* termination will almost always be sufficient to show coercion"; however, it is not the *only* evidence that can be considered. (Emphasis added.) *See Graham* at ¶ 24; *Walker v. State Med. Bd. of Ohio*, 10th Dist. Franklin No. 01AP-791, 2002 WL 243318, *5 (Feb. 21, 2002) ("The potential loss of her medical license does not, in and of itself, raise a claim of compulsion by the state."); *State v. Connor*, 124 Idaho 547, 548, 861 P.2d 1212 (1993) (stating that evidence of a "policy, rule, or regulation concerning the effect on the employment of a state police officer who refuses to cooperate in an investigation" is evidence of "an objectively reasonable belief that [the] use of the Fifth Amendment in response to questions would result in" the loss of a job).

**{¶37}** Further, the State's contention that "the mere possibility of license revocation is insufficient to show that the person had an objectively reasonable expectation of discharge" misconstrues the Supreme Court of Ohio's recitation in *Graham*. (Appellee's Brief at 6, citing *Graham* at ¶ 23, citing *Sapp*, 934 P.2d at

1372). In *Graham*, the court offered that "'*ordinary* job pressures, such as the possibility of discipline or discharge for insubordination, are not sufficient to support an objectively reasonable expectation of discharge.'" (Emphasis added.) *Graham* at ¶ 23, quoting *Sapp* at 1372. The case to which the court cited in *Graham—Sapp—*follows its "ordinary-job-pressures" statement with the rule that for a "subjective belief that [a person] might be fired to be considered objectively reasonable for purposes of *Garrity* immunity, it must be supported by some demonstrable action of the state."[7] *Sapp* at 1372. Thus, a subjective belief will be considered objectively reasonable if the state played a role in creating an impression that the refusal to give a statement will be met with the type of penalty prohibited under *Garrity*. *Camacho* at 1515, citing *United States v. Solomon*, 509 F.2d 863, 871-872 (2d Cir.1975) and *United States v. Montanye*, 500 F.2d 411, 415 (2d Cir.1974).

{¶38} The evidence in the record reflects that the circumstances surrounding the administrative investigation at issue in this case show some demonstrable, coercive action by the state beyond the general directive to cooperate. Indeed, the combination of Gideon's duty to cooperate under R.C. 4731.22(B)(34) and Investigator Yoakam's process in this case exceeded an *ordinary* job pressure to

---

[7] The Supreme Court of Ohio was not presented in *Graham* with a situation involving a subjective belief that a person might suffer a penalty because the sanction in that case was expressly conveyed. *See State v. Graham*, 136 Ohio St.3d 125, 2013-Ohio-2114, ¶ 25.

cooperate. As we have noted, R.C. 4731.22(B)(34) requires licensees to cooperate with investigations of the board.[8] *Compare Goodpaster* at 1029 (noting that "Goodpaster was subject to a regulation * * * requiring that he 'cooperate with all audits, reviews, and investigations conducted by the Office of Inspector General'"), quoting 39 C.F.R. 230.3(a). R.C. 4731.22(B) puts licensees on notice that their failure to cooperate, amongst other reasons, will penalize their license (by a vote of no fewer than six members of the board). *Compare id.* ("The same regulation provides that 'failing to cooperate [* * *] may be grounds for disciplinary or other legal action.'"), quoting 39 C.F.R. 230.3(a).

{¶39} Further, in addition to R.C. 4731.22(B)(34)'s directive to cooperate with the board's investigation, the record reflects "some demonstrable action of the state" supporting Gideon's subjective belief. *See Sapp* at 1372; *Camacho* at 1518. In this case, the demonstrable action of the State lies with Investigator Yoakam's conduct and his intent underlying that conduct. *Compare Camacho*, 739 F.Supp. at

---

[8] It appears that the State contends that R.C. 4731.22(B)(34)'s duty to cooperate requires *only* that a subject answer truthfully questions posed by an investigator of the board during an interview. *Compare United States v. Goodpaster*, 65 F.Supp.3d 1016, 1029 (D.Or.2014) (noting that "[a]n order to 'cooperate' demands more of the reasonable employee than an order merely to be 'truthful'"), citing *Minnesota v. Murphy*, 465 U.S. 420, 434, 104 S.Ct. 1136 (1984) (observing that "Murphy's probation condition [to be truthful] proscribed only false statements"). That is, the State argues that "[t]elling falsehoods * * * is different than remaining silent, and the Fifth Amendment is not implicated." (Appellee's Brief at 6). However, the text of that subsection of the statute states that a subject must *cooperate* in investigations of the board. R.C. 4731.22(B)(34) proceeds to provide a non-exhaustive list of ways in which a subject must cooperate with an investigation of the board—only one of which is to provide truthful answers to questions presented by the board in an investigative interview. *See In re Hartman*, 2 Ohio St.3d 154, 155-156 (1983) (noting that the word "'including' implies that that which follows is a partial, not an exhaustive listing of all that is subsumed within the stated category. 'Including' is a word of expansion rather than one of limitation or restriction.").

1518-1519 (construing the evidence in the record reflecting the "actions of the investigators" to determine whether there was "demonstrable state conduct" and, thus, whether the defendants' beliefs that they would penalized for asserting their Fifth Amendment rights were objectively reasonable).

{¶40} At the suppression hearing, Investigator Yoakam testified to the extent that he collaborated with law enforcement as part of his investigation—that is, he specifically stated that the investigation of Gideon "turned into a joint investigation." (Aug. 22, 2017 Tr. at 4); (Oct. 13, 2017 Tr. at 7, 20-21). Indeed, Sergeant Hochstetler concurred that he and Investigator Yoakam agreed "to cooperate with each other" during the course of their investigations. (Oct. 13, 2017 Tr. at 51-52). By cooperating, Sergeant Hochstetler clarified that meant that he and Investigator Yoakam would share information. Investigator Yoakam elaborated that the Revised Code permits him to share information obtained as part of his investigations with law enforcement and that he will share such information if there is "a shared interest." (*Id.* at 19-20). Investigator Yoakam further testified that he shared the information he collected (regarding Gideon) with the Bluffton Police Department.

{¶41} Undeniably, R.C. 4731.22(F) provides, in relevant part, the following:

(3) In investigating a possible violation of this chapter or any rule adopted under this chapter, * * * the board may question witnesses, conduct interviews, administer oaths, order the taking of depositions, inspect and copy any books, accounts, papers, records, or documents,

issue subpoenas, and compel the attendance of witnesses and production of books, accounts, papers, records, documents, and testimony, except that a subpoena for patient record information shall not be issued without consultation with the attorney general's office and approval of the secretary and supervising member of the board.

* * *

(4) All * * * investigations * * * of the board shall be considered civil actions for the purposes of section 2305.252 of the Revised Code.

(5) * * *

The board may share any information it receives pursuant to an investigation * * * with law enforcement agencies, other licensing boards, and other governmental agencies that are prosecuting, adjudicating, or investigating alleged violations of statutes or administrative rules.

R.C. 4731.22(F)(3)-(5) (Apr. 6, 2017) (current version at R.C. 4731.22(F)(3)-(5) (Mar. 20, 2019)).[9]

{¶42} Thus, while there is nothing inherently wrong with Investigator Yoakam and law enforcement's agreement to share information, the evidence in the record reveals that Investigator Yoakam exceeded statutorily permissible collaboration by taking demonstrable steps to coerce Gideon to provide him an

---

[9] R.C. 2305.252 applies to peer-review privilege. *See, e.g.*, *Cousino v. Mercy St. Vincent Med. Ctr.*, 6th Dist. Lucas No. L-17-1218, 2018-Ohio-1550, ¶ 15 ("The purpose of this statute is to protect the integrity and confidentiality of the peer review process so that health care entities have the freedom to meaningfully review and critique—and thereby improve—the overall quality of the healthcare services they provide."). The statute also applies the peer-review privilege to *only* the Bureau of Workers' Compensation ("BWC"); however, the statute excepts the BWC to "share proceedings and records within the scope of the peer review committee * * * with law enforcement agencies, licensing boards, and other governmental agencies that are prosecuting, adjudicating, or investigating alleged violations of applicable statutes or administrative rules". R.C. 2305.252(B).

incriminating, oral and written statement in reliance on Gideon's duty to cooperate. In other words, Investigator Yoakam was posing as a "straw man" to effectuate law enforcement's criminal investigation. *See State v. Gradisher*, 9th Dist. Summit No. 24716, 2009-Ohio-6433, ¶ 23 (Belfance, J., dissenting) (approving the "concern that government agents should not pose as 'straw men' in order to effectuate police investigations"). Specifically, Investigator Yoakam contacted Sergeant Hochstetler prior to interviewing Gideon, and "discussed that [he] was going to hold off on the administrative investigation until [law enforcement determined] that [Investigator Yoakam] could interview [Gideon]." (Oct. 13, 2017 Tr. at 7-8). Investigator Yoakam's intention for sharing his investigative plan with law enforcement was to "determine how [law enforcement] was going to proceed with the criminal case" because proving an administrative-sanction case is easier "from a criminal conviction" as opposed to "through witness testimony." (*Id.* at 15-16). That is, he elaborated that his method is "what they call a bootstrap on a criminal case that's where a physician * * * is criminally charged, and the Board takes action on that criminal disposition, and the other [is] based on information gathered in the course of an investigation. Action that's taken based on that." (*Id.* at 15).

{¶43} Prior to Investigator Yoakam's interview of Gideon, Sergeant Hochstetler told Investigator Yoakam that Gideon "denied any improprieties during [law enforcement's] interview" of Gideon. (Oct. 13, 2017 Tr. at 21, 55). And, after

discussing Gideon's denials to law enforcement with Sergeant Hochstetler, Investigator Yoakam informed Sergeant Hochstetler that it would not be "appropriate" for law enforcement to jointly interview Gideon with Investigator Yoakam. (*Id.* at 28, 55-56). Specifically, Investigator Yoakam testified that

> doctor's [sic] are obligated to cooperate in our investigation. So [he] did not want that to * * * impede in * * * any of the criminal proceedings…And [he] didn't want * * * there to be an issue that the doctor provided a statement with law enforcement present because the provider is *obligated to cooperate in our investigations*.

(Emphasis added.) (*Id.* at 29). (*See also* Oct. 13, 2017 Tr. at 55); (Defendant's Ex. 4). In other words, Investigator Yoakam's method was to avoid a scenario in which his interview (of Gideon) could not be used as part of the criminal case because (as indicated by Investigator Yoakam) the lack of a criminal conviction would make his administrative-sanction case more cumbersome. *Compare Gradisher* at ¶ 23 (Belfance, J., dissenting) (expressing concern that "government overreaching could easily occur by pushing off criminal investigations to state agents so as to bypass protection against the abridgement of an individual's Fifth Amendment rights"); *Camacho*, 739 F.Supp. at 1519 (noting that the investigator's action in purposely omitting "his preamble regarding voluntariness and compulsion * * * in order to avoid flagging the issue of voluntariness" "speaks louder" than any belief that the statements were voluntary and concluding that "the investigators' central aim was to take a statement first and litigate its admissibility later").

{¶44} Moreover, based on our review of the record, Investigator Yoakam's intent for the investigation reflects the demonstrable state action necessary to support Gideon's subjective belief that his medical license would be penalized if he failed to cooperate with Investigator Yoakam's investigation. Specifically, Investigator Yoakam's interview of Gideon reflects his intent to assist law enforcement in obtaining a criminal conviction of Gideon for purposes of influencing the outcome the administrative-sanction case against Gideon.

{¶45} Even though he is not a law enforcement officer, Investigator Yoakam testified that he had law enforcement training and is familiar with the elements of offenses under the Revised Code, including sexual imposition. Keeping his training in mind, Investigator Yoakam arrived unannounced to Gideon's medical office to conduct his interview to catch him "off guard" "to get the truth out of [him]." (Oct. 13, 2017 Tr. at 5, 32-33). Despite Gideon having patient appointments at the time of the visit, Investigator Yoakam did not advise Gideon that he did not have to speak with him that day or otherwise offer to reschedule—he merely asked Gideon "if he would have a few minutes to chat with" him. (*Id.* at 5). (*See also* State's Ex. A). In other words, Investigator Yoakam did nothing to dissuade Gideon's belief that he was statutorily obligated to cooperate with his investigation, which included consenting to Investigator Yoakam's request to "chat." *Compare Camacho* at 1511 ("At no time during the interview or after did either Sergeant Green or Assistant

State Attorney DiGregory make any effort to dissuade Sinclair of his view that he was compelled to give a statement or answer his question.").

**{¶46}** Likewise, and unbeknownst to Gideon, Investigator Yoakam recorded the interview even though it is not the board's "protocol" to surreptitiously record interviews of subjects. (*See* Aug. 22, 2017 Tr. at 5-6); (State's Ex. A). (*See also* Oct. 13, 2017 Tr. at 7, 13). Rather, as a "general practice" of his office, Investigator Yoakam secretly records interviews of subjects involving sexual-impropriety allegations. (Aug. 22, 2017 Tr. at 5-6). (*See also* Oct. 13, 2017 Tr. at 7, 33-34). Further, Investigator Yoakam testified that he does not inform providers that they are being recorded because "[s]ometimes if * * * a provider knows that they're being recorded then they're more guarded in what they say." (Oct. 13, 2017 Tr. at 34). Moreover, Investigator Yoakam chose not to inform Gideon that he intended to share with law enforcement Gideon's statements despite it being his intention to do so.

**{¶47}** During the two-hour "chat," Investigator Yoakam pressured Gideon "that [he] wanted to get [the] interview done there * * * on all the subjects [he] wanted to address, because [he] did not want to return" and that he "did not want to *drag him through the mud* by interviewing multiple people." (Emphasis added.) (*Id.* at 39). *Compare Camacho*, 739 F.Supp. at 1518 (considering the evidence that the defendants were not asked to provide statements, but rather, directed to provide

statements and the evidence that the investigators would not "even answer [the] question as to whether the inquiry was administrative or criminal in nature").

**{¶48}** In addition, during the interview, Investigator Yoakam advised Gideon at multiple points to "to go back to [law enforcement] and change his statement" to avoid facing possible falsification charges. (Oct. 13, 2017 Tr. at 22). Investigator Yoakam's insistence that Gideon return to law enforcement to change his statement is also evidence supporting Gideon's belief that a refusal to give a statement will be met with a licensure penalty. That is, Investigator Yoakam's insistence that Gideon provide law enforcement with a statement reflects an intent to coerce Gideon to cooperate with the investigation. Indeed, (as raised during cross-examination) if Investigator Yoakam was "just concerned about [the] medical investigation there would be no need to tell [Gideon] to go back to the police department and change his statement * * *." (*Id.* at 22).

**{¶49}** The record also reflects that Gideon and Investigator Yoakam possessed an implicit, trust-like relationship and that Investigator Yoakam exploited that relationship to satisfy his ulterior motive of coercing Gideon into making statements against his interest for law enforcement to ultimately obtain a criminal conviction against him. That is, Gideon and Investigator Yoakam had a 15-year relationship during which Investigator Yoakam investigated a prior complaint against Gideon (which was determined to be unsubstantiated). Based on their prior

relationship, Gideon initially contacted Investigator Yoakam by text message to inform him of the complaints at issue in this case. Likewise, Investigator Yoakam can be heard during the beginning of the interview recalling their past relationship by reminding Gideon that he has never "judged" him in their past dealings—a characterization to which Gideon agrees. The record further reflects that Investigator Yoakam was aware of Gideon's religious beliefs and, as such, used the words "confession" and "reconciliation" during his interview of Gideon because Investigator Yoakam "figured he could relate to that." (Oct. 13, 2017 Tr. at 41).

{¶50} At the conclusion of the interview, instead of reporting back to the board, Investigator Yoakam immediately went to the Bluffton Police Department to report Gideon's confessions to law enforcement. (*See* Defendant's Ex. 2). Despite his employment responsibilities with the State Medical Board, Investigator Yoakam chose to *immediately share* Gideon's confessions with law enforcement "because the doctor had [] an interview with [law enforcement] where he denied any impropriety so [he] wanted to tell [law enforcement] what happened during [his] interview." (Oct. 13, 2017 Tr. at 26-27). Moreover, Investigator Yoakam agreed that he "wanted to assist [law enforcement] in that criminal investigation by providing [law enforcement] with statements made by Dr. Gideon during an interview that same day * * *[.]" (*Id.* at 27).

**{¶51}** Accordingly, we conclude that, based on the facts and circumstances presented by this case, Investigator Yoakam's actions created an impression that Gideon's refusal to cooperate with his investigation would result in the type of penalty prohibited under *Garrity*. *See Camacho* at 1520 (concluding "that the actions of the State were directly implicated in creating [the] belief" that the defendants' subjective belief "that failure to answer would result in termination"). Therefore, Gideon's belief that his medical license would be penalized if he did not cooperate with Investigator Yoakam's investigation was objectively reasonable. *See id.* Thus, Gideon's statements were not voluntary within the meaning of *Garrity*. *Accord Graham*, 136 Ohio St.3d 125, 2013-Ohio-2114, at ¶ 30 ("Statements extracted under these circumstances cannot be considered voluntary within the meaning of *Garrity*."); *Goodpaster*, 65 F.Supp. at 1033 (Under the facts presented, the Government created a 'classic penalty situation' by threatening to punish Goodpaster for remaining silent. Accordingly, under the Supreme Court's decision in *Garrity v. New Jersey* and its progeny, Goodpaster's statements must be suppressed.").

**{¶52}** For these reasons, we conclude that the trial court erred by denying Gideon's motion to suppress oral and written statements that he made to Investigator Yoakam as evidence. His first assignment of error is sustained.

**Assignment of Error No. II**

**The Trial Court's Order Consolidating the Separately-Docketed Sexual Imposition Charges for the Trial Exposed Defendant-Appellant to a Substantial Likelihood that the Jury Would "Bootstrap" the Allegations of Different Patients in Contravention of Evid.R. 404(B) and R.C. 2907.06(B), and Thereby Violated His Sixth and Fourteenth Amendment Right to a Fundamentally Fair Jury Trial. (Apx. A-19; 04/20/18 Tr. 82-84; 04/21/18 Tr. 20-21)**

**Assignment of Error No. III**

**The Trial Court's Instructions and the Prosecutor's Closing Argument Encouraged the Jurors to Consider the Testimony of One Alleged Victim as Corroboration of the Testimony of Another Alleged Victim in Contravention of Evid.R. 404(B) and R.C. 2907.06(B), and Thereby Violated Defendant-Appellant's Right to a Fundamentally Fair Jury Trial Under the Sixth and Fourteenth Amendments to the United States Constitution. (04/18/18 Tr. 115-17; 04/21/18 44, 104-05, 114-15)**

**Assignment of Error No. IV**

**Defendant-Appellant's Conviction for Sexual Imposition as to Former Patient [M.M.] is Not Supported by Sufficient Evidence to Satisfy the Requirements of the Due Process Clause of the Fourteenth Amendment to the United States Constitution. Alternatively, the Jury's Guilty Verdict is Against the Manifest Weight of the Evidence. (04/20/18 Tr. 79; 04/21/18 Tr. 20-21).**

{¶53} In his second, third, and fourth assignments of error, Gideon argues

that: (1) he was unfairly prejudiced by the trial court's order consolidating the cases

for purposes of trial; (2) the trial court and the State improperly encouraged the jury

to consider the testimony of one victim as corroborating evidence of the veracity of

another victim's testimony; and (3) his conviction in case number 17CRB01385 is based on insufficient evidence and is against the manifest weight of the evidence.

{¶54} In light of our decision to sustain Gideon's first assignment of error, his second, third, and fourth assignments of error are rendered moot, and we decline to address them. App.R. 12(A)(1)(c); *State v. Unger*, 5th Dist. Stark No. 2016 CA 00148, 2017-Ohio-5553, ¶ 22; *State v. Caldwell*, 4th Dist. Jackson No. 97-CA-802, 1998 WL 8847, *2 (Jan. 8, 1998). *See also State v. Ecker*, 9th Dist. Summit No. 28431, 2018-Ohio-940, ¶ 10-12 (suggesting that joinder decisions are ripe for review after the trial court has had the opportunity to evaluate a defendant's Crim.R. 14 motion for severance at trial).

{¶55} Having found error prejudicial to the appellant herein in the particulars assigned and argued in his first assignment of error, we reverse the judgments of the trial court and remand for further proceedings.

*Judgments Reversed and
Causes Remanded*

**WILLAMOWSKI and SHAW, J.J., concur.**

**/jlr**

-41-